Tirese JOHNSON, et al., Plaintiffs,

v.

**PREFERRED PROFESSIONAL
INSURANCE COMPANY,
et al., Defendants.**

**C.A. No. N13C–01–119RBY.**

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 1, 2013.

Decided: Feb. 17, 2014.

---

Francis J. Murphy, Esquire, Murphy & Landon, Wilmington, Delaware, for Plaintiffs.

William J. Cattie, III, Esquire, Rawle & Henderson, LLC, Wilmington, Delaware, for Defendant Preferred Professional Insurance Company.

John A. Elzufon, Esquire, Elzufon Austin Tarlov & Mondell, P.A., Wilmington, Delaware, for Defendant Michelle Montague.

Colm F. Connolly, Esquire, Morgan Lewis & Bockius, LLP, Wilmington, Delaware, for Defendants Mason E. Turner, Jr. and Prickett, Jones & Elliott, P.A.

## OPINION

YOUNG, J.

### SUMMARY

This addresses the several Motions to Dismiss filed by the various Defendants.

At this early stage of the proceedings, where a Court views all of the pled circumstances extant in a light most favorable to the responding party (here, the Plaintiffs), sufficient factual dispute exists, relative to the claims under the general aegis of fraud (which is to say: Counts I, II, III, IV, V, VI, VII, IX, X, XI, XII and XIII), independent of those allegations considered and determined by prior rulings of both the Superior and Supreme Courts, to overcome those Motions to Dismiss. Hence, they are **DENIED.** As to Count XIV, the Motions to Dismiss are **GRANTED.**

All Motions to Stay Discovery are now *moot.* Discovery, to the extent that it has been delayed, should proceed forthwith.

### FACTS

Plaintiffs are Tirese Johnson, a minor child, and his Guardian Ad Litem ("Johnson or Plaintiffs"). The allegations in the First Amended Complaint arise in relation to two prior lawsuits previously adjudicated by this Court. The first prior suit was a medical negligence action filed in 2007 by Johnson's mother, Letoni Wilson ("Wilson") on his behalf, against Michelle Montague ("Montague") and Dr. Phyllis James ("Dr. James"). The Medical Negligence Action alleged that Montague, a physician's assistant employed by Dr. James, negligently failed to treat and diagnose Johnson for jaundice. As a result, Johnson developed Kernicterus, resulting eventually in permanent brain damage. The second prior suit was a bad faith action brought by Dr. James against her insurer, Preferred Professional Insurance Company ("PPIC").

#### The Medical Negligence Action:

On July 21, 2006, then four-day old Tirese Johnson was brought by his parents to New Castle Family Care, an unincorporated medical practice operated by Dr.

James. He was examined by Montague. who noted that Johnson was jaundiced, a medical condition characterized by the yellowing of the skin. Jaundice occurs when the body is not properly breaking down bilirubin. When high levels of bilirubin are present, the condition is called Kernicterus. If left untreated, Kernicterus can lead to brain damage. Shortly after her examination of Johnson, Montague created a medical record/office note in her own handwriting which she signed. In that note, Montague recorded the observation that Johnson was positive for "yellow tint face/abdomen."

On Sunday July 23, 2006 at 11:30 a.m. Johnson's mother called Montague to report an increased yellow tint to both eyes and his skin. Montague advised Wilson that she could take her son to the Medical Aide Unit near Christiana Hospital, or could bring him in to New Castle Family Care the next morning. Later that day, Johnson was taken to Christiana Hospital where he was seen by an emergency room physician at 2:42 p.m. He was diagnosed later that day with Kernicterus. Johnson suffered permanent brain and neurological damage as a result of the high bilirubin level and his jaundiced condition.

In 2007, Wilson filed a medical negligence action on behalf of Johnson against Montague and Dr. James. The complaint in that case alleged that the medical care provided by Defendants violated the standard of care, resulting in Johnson's physical injuries and mental anguish.[1]

The Trial Court granted summary judgment in the Medical Negligence Action in favor of Defendant Michelle Montague on March 10, 2010. The ground for that decision was that Johnson had failed to satisfy the requirement of 18 *Del.Code* § 6853(e)

that he provide an admissible expert opinion that Montague had violated the standard of care applicable to a physician's assistant. That judgment was appealed.

### The Bad Faith Action:

In March 2010, the Medical Negligence Action against Dr. James went to trial. A verdict was rendered for the Plaintiff in the amount of $6,250,000.00. Because the verdict against Dr. James was in excess of the limits of her insurance coverage with PPIC, Dr. James brought an action in Superior Court for bad faith breach of her insurance policy (against PPIC), and for legal negligence against the law firm that represented her in the Medical Negligence Action. During discovery in the Bad Faith Action, Wilson and her Attorney, Kenneth M. Roseman, Esquire ("Roseman") learned for the first time about alterations that had occurred to the patient chart of Johnson in the aftermath of his hospitalization.

### The Present Case:

In the present case, Plaintiffs allege that on the morning of July 24, 2006, the day after Johnson's admission to the hospital, Dr. James informed Montague of Johnson's hospitalization and condition. It was at this point that Plaintiffs claim the process of a coverup began. Montague and Dr. James allegedly discussed the original office note. At some point after that conversation, Montague removed the original note from Johnson's patient chart. Then, at some point on or after July 24, 2006, Montague prepared a new office note ("Altered Montague Office Note") which she placed in Johnson's patient chart. The Altered note stated that the yellow tint was limited to the face and sternum of

---

1. Though Letoni Wilson was the only listed plaintiff in the original case, for the purpose of continuity with the present case, all refer-

ences to the party bringing suit on behalf of Johnson will be referred to as Plaintiffs.

Johnson, rather than extending to the abdomen as the original note had stated.

Montague left New Castle Family Care in or around September 2006. When she left, Montague took either a copy or the original of her first office note, a copy of the altered note, and a copy of a note Dr. James had made (prior to alteration) for Johnson's chart.

PPIC retained attorneys to represent both Montague and Dr. James in the Medical Negligence Action brought by Johnson's family against them. Daniel McCarthy ("McCarthy") of Mintzer Sarowitz Zeris Ledva & Meyers, LLP was the attorney retained by PPIC to represent Dr. James. He was admitted *pro hac vice* by order of the Delaware Superior Court for this purpose. Mason E. Turner, Jr. ("Turner"), employed at the time by Prickett, Jones & Elliott, P.A., ("PJE"), was the attorney retained by PPIC to represent Montague.

On September 2, 2008, McCarthy and Turner took the deposition of Wilson. After her deposition, Turner told McCarthy about the alterations to Johnson's chart, providing him with copies of the original notes written by Dr. James and Montague. At this time, both attorneys were well aware of the fact that the notes had been altered by their clients after learning of Johnson's hospitalization and brain damage. Neither attorney informed the Plaintiffs or Plaintiffs' counsel of these alterations.

After learning of the alterations to the medical records of Johnson, McCarthy sent a letter, dated September 12, 2008, to Luanne C. Cornell ("Cornell"), in-house attorney at PPIC. This letter reported the information about the altered patient chart, providing copies of the Montague Original Office Note, Montague Altered Office Note, Dr. James Original Office Note, and Dr. James Altered Office note.

It also included a sentence asking Cornell to call to discuss these issues. On September 19, 2008, McCarthy sent Cornell another letter. This letter indicated that the two of them had already talked about the first letter, and that McCarthy wanted to speak about the issue again. Plaintiffs allege that Turner also reported and discussed these alterations with representatives of PPIC.

On December 9, 2010, Cornell was deposed in the Bad Faith Action brought by Dr. James against PPIC. In that deposition, Cornell testified that she mistakenly believed that the records (including both original office notes) had been produced to the Plaintiffs in the Medical Negligence Action. She based this conclusion on the assumption that McCarthy "responded honestly to the records request." However, it is now clear that Plaintiffs in the original Medical Negligence Action were not provided or made aware of the existence of these notes in the course of that litigation. It was not until discovery in the Bad Faith Action, that Plaintiffs' counsel became aware of their existence. Cornell's deposition, supported by other evidence, indicates that PPIC, McCarthy, and Turner knew these notes were relevant to the Medical Negligence Action and thought they would likely make it more difficult to defend.

Plaintiffs, now aware of the existence of the altered notes, look back on the prior litigation, and point to occasions when those notes should have been produced or disclosed. Furthermore, there are specific instances where both Dr. James and Montague perjured themselves when questioned about the exam, the patient chart and existence of any additional notes/records. The Complaint in the present case also describes how Turner and McCarthy, with full knowledge of the notes allowed their clients to perjure themselves in depo-

sitions. Both attorneys also failed to disclose the existence or produce the notes to the Plaintiffs, despite being aware of their relevance. These allegations are particularly true for Montague and Turner who were specifically aware of the existence of both sets of notes, as Montague had copies of all of them and had participated in their creation. Montague has contended that the Montague Original Office Note was merely a draft prepared before she was able to review and finalize the information with Dr. James. She asserts further that the alterations resulted from a meeting with Dr. James in which it was suggested that she change the term "abdomen" to "sternum" to reflect more accurately her observations during the exam.

### Motion to Vacate, Reargument, and Subsequent Appeal of Judgment Entered in Favor of Montague:

On or about September 30, 2010, PPIC responded to a request for production filed by Dr. James in the Bad Faith Action. The response contained the September 12, 2008 letter (discussed above) from McCarthy to Cornell, regarding the alterations to Johnson's medical records. As a result of this letter's being produced, the Plaintiffs from the Medical Negligence Action became aware of the existence of the additional notes for the first time. In response to this new information, Roseman filed a Motion to Vacate the Judgment Entered in Favor of the Defendant, Michelle Montague. That Motion alleges that, had Plaintiffs been aware of the alterations, they would not have been "forced to settle" on the expert witness they had chosen. This was the expert that had been found unqualified by the Court in the original action, resulting in the dismissal of Plaintiffs' Medical Negligence Action against Montague.

The Superior Court denied Plaintiffs' Motion to Vacate by order dated October 22, 2010. According to the Opinion, the Superior Court denied the motion because the Plaintiffs did not establish "a likelihood that the original examination note would change the outcome of the motion to dismiss that arose from her failure to procure a qualified expert opinion ... It would not have altered his [Dr. Bauchner's] lack of qualification to opine as to the standard of care applicable to a physician's assistant-at most, it might have made his opinion against Montague more emphatic, but that opinion would have remained inadmissible." As for Plaintiff's claim that she might have been able to procure a different expert had she been aware of the altered notes, the Court held that "she has not offered any reasoning as to how the existence of the original note might have changed the opinions of the other consulted experts, who offered assessments that were 'more equivocal [than Dr. Bauchner's] or who declined to support the claim against Montague.'" As a result of these findings, the Superior Court held that Plaintiff had not met her burden of showing that a different outcome was probable.

Upon receiving the Court's decision, Plaintiffs filed a Motion for Reargument. In that motion, Plaintiffs argued that the Court had misapprehended the law when it concluded that, as a party seeking relief under Rule 60(b)(3), Plaintiff had to present proof of a "fair likelihood of success on the merits if relief is granted." It was Plaintiffs' position that the language in question, while contained in a prior Supreme Court decision, was actually non-controlling dicta. Plaintiffs argued that the Court should have considered the standard applied by federal courts for the equivalent federal rule, which would not require Plaintiffs to demonstrate a fair likelihood of success to have relief granted.

In a decision dated December 2, 2010, the Superior Court denied Plaintiffs' Motion for Reargument. The Court stated that it was not convinced that the Delaware Supreme Court's statement that "a petition under Rule 60(b)(3) must demonstrate a fair likelihood of success on the merits if the judgment were to be reopened" was dicta. The Superior Court also noted that the Supreme Court had affirmed decisions imposing a requirement that parties proceeding under the parallel Rule 60(b)(3) in the Court of Chancery offer a showing that the adverse party "improperly obtained" the judgment through fraud or other misconduct, or offer a basis upon which the could would conclude that it probably would have ruled otherwise had it known of the improper activity. The Superior Court also held that, even if the burden-shifting framework proposed by Plaintiffs' were applied, the misconduct in question had caused no prejudice to the Plaintiffs. This was because the sole reason for the dismissal of the case was the Plaintiffs' failure to have a proper expert.

Plaintiffs next appealed the Superior Court's denial of the Motion to Vacate to the Supreme Court. In that appeal, Plaintiffs argued that the Superior Court had abused its discretion in failing to make a specific finding that Montague and her attorney had engaged in misconduct. Plaintiffs also argued that the Superior Court erred in interpreting Rule 60(b)(3) to require a showing that Plaintiffs were prejudiced by Montague's alleged misconduct. Finally, Plaintiffs argued that the Superior Court also erred in interpreting Rule 60(b)(3) to require Plaintiffs to show that the evidence that had been concealed would have changed the outcome of the litigation.

The Supreme Court affirmed the decision of the Superior Court, holding that the Superior Court had not abused its discretion. The Supreme Court explained that it found there to be only a subtle (if any) distinction between the test applied and the test suggested by the Plaintiffs. The Court found no merit to Plaintiffs' third reason for the appeal, holding the Superior Court's analysis to be persuasive. Importantly, early on in the Supreme Court order, the Court noted that "on appeal from grant or denial of a motion for relief under Rule 60(b) a party may attack only the propriety of the order" not the merits of the underlying judgment.

Plaintiffs subsequently filed a Motion for Reargument and for Rehearing *En Banc* with the Delaware Supreme Court. The Motion was based on Plaintiffs' position that the Court had overlooked controlling precedent in applying the outcome determinative prejudice test. The Supreme Court held that they had analyzed both possible tests, discussed the distinction, and ultimately found the Superior Court's position to be persuasive. A case closed mandate was then issued by the Supreme Court Clerk.

At some point after this, Plaintiffs became aware of the true depth of the misconduct and fraud. They have now filed a new Complaint with this Court, containing fourteen counts. The first count alleges fraud upon the court through an independent action for relief. The remaining counts referred to in the *Summary* are, from a standpoint of a Motion to Dismiss, associated. Each Defendant has filed such a Motion to Dismiss.

### STANDARD OF REVIEW

The applicable standard of review for a motion to dismiss is well-settled. For this purpose, the Court is to accept all

well-pled allegations as true.[2] To be well-pled, the complaint must put the opposing parties on notice of the claims being brought.[3] If the complaint and facts alleged are sufficient to support a claim upon which relief may be granted, the motion must be denied.[4] If any reasonable conception can be formulated to allow Plaintiff's recovery, the Motion to Dismiss must be denied.[5] Dismissal is warranted only when "under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[6]

### DISCUSSION

#### Count One: Independent Action for Relief From Judgment

The Delaware Superior Court Civil rules are modeled after the Federal Rules of Civil Procedure, and thus are largely the same. This is particularly true for the Rule at issue in this case, Rule 60. For that reason, where Delaware case law is silent, the Court has looked to Federal case law, as well as the case law from other jurisdictions for guidance in handling some of the complex issues present in the instant case. There are only four permitted procedures for a party seeking relief from a final judgment. First, Rule 60(b) establishes a simple motion procedure. Rule 60(b) lists six substantive grounds for relief from a judgment or order. In this case, the applicable subpart is 60(b)(3), which allows relief for fraud. Plaintiffs did previously make a 60(b)(3) motion to the Superior Court (and subsequent motion for reargument), which was denied. Contrary to Defendants' contention, denial of a 60(b)(3) motion does not necessarily serve as an absolute bar to later motions or *sua sponte* action by the Court under its inherent power or through an independent action. In fact, secondary materials on the topic opine that a plaintiff's filing of a 60(b) motion, would be preferred before a filing for relief under an alternative method. It should also be noted and stressed that, at the time Plaintiffs filed the 60(b)(3) motion in the original case, they were unaware of the full extent of the alleged fraud and concealment of evidence, about which they would later learn. Finally, the pleadings in that motion and the subsequent motion for reargument are allegedly based in part on ongoing fraud and misrepresentations.

■ The next method for seeking relief from judgment is through an independent action for relief from judgment, also called an independent action in equity for relief from judgment. This procedure was well established before the federal rules were adopted. In constructing the federal and state rules, drafters were careful to include language to ensure that this procedure would still exist. The pertinent language reads: "This Rule does not limit the power of a Court to entertain an independent action to relieve a party from judgment, order or proceeding ..."

■ This additional method of relief was preserved in spite of the new compre-

---

2. *Loveman v. Nusmile, Inc.*, 2009 WL 847655, at *2 (Del.Super. March 31, 2009), citing *Anglo American Sec. Fund, L.P. v. S.R. Global Intern. Fund, L.P.*, 829 A.2d 143, 148–49 (Del. Ch.2003).

3. *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *2 (Del.Super. April 24, 2001) citing *Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.*, 654 A.2d 403, 406 (Del.1995).

4. *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

5. *Id.*

6. *Id.*

hensive motion procedure established by Rule 60. Unlike Rule 60(b), which requires that the motion generally must be brought in the court that rendered the judgment, and within a reasonable time (generally one year), an independent action could be brought in another court or where a 60(b) motion is time barred.[7] With that said, independent actions under this rule are generally seen as a limited remedy.[8] Judgments should only be set aside in very serious situations. The equitable doctrine of laches applies to independent actions in equity.[9] Thus, an undue delay in bringing an independent action for relief may defeat the action, just as a 60(b) motion could be time barred.

The third method pertains to relief provided by statute. This method is not applicable to the present case. It will be discussed no further.

■ The final basis for relief from judgment comes through the inherent power of a court to set aside a judgment that was obtained through fraud upon the court. Basic fraud, misrepresentation and other types of misleading or corrupt conduct carried out by an opposing party in the course of litigation are already covered by the six bases in Rule 60(b). Fraud on the court is a different, more serious, species, generally limited to fraudulent conduct that seriously "affects the integrity of the normal process of adjudication."[10] It is also fre-

quently described as fraud that attempts to, or does, "defile the court itself."[11] Clear examples of fraud on the court include bribery of a judge, jury tampering, or hiring an attorney for the sole purpose of improperly influencing the court.[12]

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.* is considered the leading case in the field.[13] In this 1944 United States Supreme Court decision, the Court considered "the power of a Circuit Court of Appeals, upon proof that fraud was perpetrated on it by a successful litigation, to vacate its own judgment ... and direct vacation of a District Court's decree entered pursuant to the Circuit Court of Appeals' mandate."[14] This case arose from a 1928 suit brought by Hartford–Empire Co., charging that Hazel was infringing on its patent.[15] In 1926, while Hartford's application for a patent was pending, and in the face "insurmountable Patent Office opposition," Plaintiff's counsel and other officials drafted a favorable trade journal article on the subject of the glass blowing process at issue in the patent.[16] At least some of the same people who played a role in getting the article published, securing the patent, also helped to bring the article to the Court's attention.[17] There was also further behind-the-scenes corruption involving bribing and covering up a witness to the article's nefarious roots. Partially relying on the article, the Court ruled that the patent was valid

---

7. *Moore's Federal Practice,* § 60.21[2].

8. *Id.*

9. *Id.*

10. *Id.* at § 60. 21[4].

11. *Id.* (citing *Great Coastal Express, Inc. v. International Brotherhood of Teamsters,* 675 F.2d 1349, 1356 (4th Cir.1982)).

12. *Moore's Federal Practice,* § 60.21[4][a].

13. 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

14. *Id.* at 239, 64 S.Ct. 997.

15. *Id.* at 241, 64 S.Ct. 997.

16. *Id.*

17. *Id.*

and infringed.[18] *Hazel* attempted to investigate the roots of the article, which it heard might be problematic. However, the representatives of *Hartford* had already gotten to the key witness before *Hazel's* investigator could.[19] Eventually, and long after the judgment, *Hazel* would come to learn that the article was fraudulent.[20] At that time, *Hazel* filed a petition for leave to file a bill of review at the District Court (and later to the Circuit Court) to set aside the judgment that had been entered against it, nearly ten years before.[21] The Circuit Court held that it could not set aside the judgment for three reasons, the most important of which for our purposes was that it lacked the power to do so because the term in which the decision had been rendered had expired.[22] The United States Supreme Court reversed the Circuit Court's decision notably stating:

> This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here ... we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.... This matter does not concern only private parties. There are issues of great moment to the public in a patent suit. Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot be complacently tolerated consistently with the good order of society. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.[23]

Plaintiffs in the instant case have provided detailed allegations in the First Amended Complaint of the purported conduct of the parties, their attorneys and the insurance company in the original litigation. These allegations, if true, are egregious and of the most serious nature.

Montague and Dr. James both are alleged to have improperly altered their office notes in preparation for litigation they believed would be forthcoming as a result of Johnson's severe injury. Montague, specifically, is alleged to have lied and omitted the fact that the medical records produced were not the full and complete story. Thus, the allegations are that Montague perjured herself in her deposition, and that the perjury was suborned by her attorney, Turner. Turner allegedly engaged in a further cover-up by discussing the issue with the attorney for Dr. James. Both of these attorneys subsequently discussed the existence of altered medical record notes with representatives of the insurance company. Throughout the course of the litigation, and subsequent motions for reargument, neither attorney provided information, corrected documents, or correct testimony regarding the notes to anyone on Plaintiffs' side or to the Court. Thus, all of the pleadings, from discovery through to the appellate filings are tainted by or based upon fraud and the purposeful concealment of evidence.

---

**18.** *Id.* at 241–42, 64 S.Ct. 997.

**19.** *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 242, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

**20.** *Id.* at 243, 64 S.Ct. 997.

**21.** *Id.* at 239, 64 S.Ct. 997.

**22.** *Id.* at 243–44, 64 S.Ct. 997.

**23.** *Id.* at 245–46, 64 S.Ct. 997.

Count one of Plaintiffs' Complaint alleges an independent action for relief from judgment for fraud upon the court. This action is brought pursuant to the portion of Rule 60(b) which provides that: "[t]his Rule does not limit the power of a Court to . . . set aside a judgment for fraud upon the Court . . ." Defendants have raised eight distinct arguments in support of dismissal of this count of the Complaint.

■ Defendants' first argument is that this Court does not have jurisdiction to hear the claim as it is a matter of equity. While both parties have discussed this claim as equitable, that seems to be a result of imprecise description. In some sense, of course, this claim is equitable since the Court is being asked to undo a judgement on the basis of that claim is being unfairly litigated due to fraud. However, the basis for the court's authority to set aside a judgment for fraud upon the court is not only a power inherent to the court that was the victim of fraud, it is a power addressed by the Superior Court Civil Rules. The imprecision concerning whether this claim is equitable or a creature of common law may also be a result of the way Plaintiffs have explained the claim: Independent Action for Relief from Judgment on the Basis of Fraud Upon the Court. This is an independent action, in that it is independent from the original case heard and decided years before. However, it is in essence an independent action aimed at bringing the fraud upon the court to the attention of this Court.

Based on a review of the relevant practice guides, it seems that, even if this were simply an independent action in equity for relief from judgment, this Court would still have jurisdiction to hear it as the dispute in question arises from alleged fraud in *this* Court, and the power to do so is reserved in this Court's civil rules. However, it is the Court's position that this action is being brought under the Court's inherent power to set aside a judgment for fraud upon the court. Either way, it is solidly within this Court's jurisdiction to hear. As a final note, with all that said, these terms are simply just separate, but related. In one sense they are used interchangeably; yet the rules and procedures applied (laches, clean-hands) are different. The main takeaway point is not whether these are equitable actions, but whether this Court has the jurisdiction and authority to hear them. The term equity, in this context, does not mean the case must be heard in the Court of Chancery. Rather, it means that, in the interest of what is fair and just, the Court may overturn its own prior decisions.

Furthermore, case law explains that "Since the original judgment, by hypothesis, must have been give in a 'case or controversy,' the court continues to have ancillary jurisdiction to determine whether it has been the victim of a fraud." [24] Jurisdiction could also be based on the theory that "a decision produced by fraud on the court is not in essence a decision at all and never becomes final." [25, 26]

---

24. 11 Fed. Prac. & Proc. Civ. § 2870 (3d ed.).

25. *Id.*

26. *See e.g., Smith v. Williams,* 2007 WL 2193748, at *3 (Del.Super. July 27, 2007) ("Unquestionably, like the federal courts, this Court has the inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of its business. In connection with this power, the Court is nec-

essarily accorded considerable latitude in dealing with serious abuses of the judicial process. In fact, the Court's decision to dismiss a case on the ground of abuse or fraud is reviewed by the standard of whether the action taken was within the realm of sound judicial discretion."); *See also Moore's Federal Practice* § 60.38 ("an independent action when brought in the court which rendered

Defendants also argue that this Court is prevented from hearing an independent action based on the Delaware Supreme Court's decision on Plaintiffs' appeal from Superior Court's decision to dismiss the case. So long as this matter proceeds properly, and with the context of the case in mind, the Superior Court has the authority to act. A passage from *Moore's Federal Practice* offers sound support for this conclusion:

> Even if a judgment has been appealed, and even if the United States Supreme Court has denied certiorari, the judgment is not immune from an independent action in equity to set it aside. After all, an independent action in equity will not lie to address any issues that were or could have been litigated in the original action. Therefore, there is no reason, even if a judgment has been appealed and affirmed, to require leave of the appellate courts before the filing of an independent action in equity seeking relief from the judgment.[27]

 Defendants next argue a related point that, even if this Court has proper jurisdiction to hear the claim, the doctrine of res judicata bars suit. The doctrine of res judicata serves as a bar "where there has been a final judgment on the merits in a first suit involving the same parties, followed by a second suit based on the same cause of action. In those circumstances, *res judicata* bars the second suit."[28] As discussed above, some theorize that a judgment based upon fraud does not constitute a final judgment at all. Even more persuasive, however, is that this is an independent action involving facts which were not only not known, but concealed

from the Plaintiffs' at the time of their original Rule 60(b) motion and Motion for Reargument. These pleadings are based upon new facts that have come to light only after that litigation ended, and through no fault of the Plaintiffs'. If what is alleged is true, critical steps in the prior judicial process were tainted by fraud and concealment on the part of the parties, attorneys and the insurance company. The goal of that fraud was to prevent Plaintiffs from finding out about the altered notes, as Defendants indicated that the Notes would make it more difficult to prevail. Furthermore, Defendants Turner, PJE and PPIC were not parties before the Court in the previous medical negligence action or on the Rule 60(b) motion.

There is also an additional argument set forth by Plaintiffs in support of the contention that res judicata does not bar this action. Plaintiffs claim that according to Delaware case law, if a party's fraud was not conclusively determined in the previous action, *res judicata* does not apply.[29] As there was already sufficient reason to find *res judicata* inapplicable, this particular argument is superfluous.

 The next argument raised by Defendants in support of their Motions to Dismiss, is that the doctrine of collateral estoppel bars Plaintiffs from bringing this claim. It is Defendants' position that the request to set aside the judgment is barred because the Superior Court already decided a "substantively identical request" which was subsequently affirmed by the Delaware Supreme Court. Under the doctrine of collateral estoppel, "where a question of fact essential to the judg-

the judgment should be regarded as such a continuation of the former action ...").

**27.** § 60.82[5].

**28.** *Smith v. Guest,* 16 A.3d 920, 934 (Del. 2011).

**29.** *Stephenson v. Capano Development, Inc.,* 462 A.2d 1069 (Del.1983).

ment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action. In such situation, a party is estopped from relitigating the issue again in the subsequent case." [30] More simply put, the required elements to establish the applicability of collateral estoppel are: "(1) a determination of fact; (2) in a prior action; (3) between the same parties." [31]

The issues and evidence presented in this claim differ from those presented in the Rule 60(b) motion previously addressed by the Superior Court. As has already been discussed, at the time of Plaintiffs' Rule 60(b) motion, Plaintiffs were not aware of the full extent of the fraud and cover-up that had been taking place. In addition, the issues raised by this action were not decided in the context of the Rule 60(b) motion. This claim asserts fraud on the court by a group of Defendants. The original Rule 60(b) motion only asserted perjury and alleged misrepresentation by Montague. As a result of these key differences in the issues, parties and the nature of the proceedings, the doctrine of collateral estoppel does not apply.

▮▮▮ The law of the case doctrine requires that issues already decided by the same court should be adopted without relitigation. Additionally, once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of the case, which will not be disturbed by that court unless compelling reason to do so appears. The law of the case doctrine also "stands for the proposition that 'findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or in a later appeal.' " [32] The law of the case doctrine encompasses principles arising from the mandate rule, which states "the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." [33] Under the principles governing both the law of the case doctrine and the mandate rule, "a trial court is 'free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision.' " [34] However, unlike *res judicata*, the law of the case doctrine is not inflexible; "it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice, or should be revisited because of changed circumstances." [35]

Defendant Montague argues that even, if collateral estoppel or *res judicata* do not bar this claim, the law of the case doctrine and/or the mandate rule would serve as a bar. Specifically, Montague contends that, as the Delaware Supreme Court already made a decision to uphold the trial court's judgment in her favor with regard to dismissal of the case and the subsequent Rule 60(b) motion, Plaintiffs should be barred from relitigating this issue. In support of her position that these doctrines are appli-

**30.** *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del.1991) (quoting *Tyndall v. Tyndall*, 238 A.2d 343, 346 (Del.1968)).

**31.** *E.B.R. Corp. v. PSL Air Lease Corp.*, 313 A.2d 893, 895 (Del.1973).

**32.** *Ins. Corp. of America v. Barker*, 628 A.2d 38, 40–41 (Del.1993)(citing *Westbrook v. Zant*, 743 F.2d 764, 768 (11th Cir.1984)).

**33.** *Id.* (quoting *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3rd Cir.1985)).

**34.** *Id.* (quoting *Bankers Trust Co.*, 761 F.2d at 950).

**35.** *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1181 (Del.2000).

cable, Montague cites to a Court of Chancery Case, *In re MCA, Inc.*[36] Defendant cites this case in apparent support of the proposition that a Supreme Court's 'affirmance' of a trial court's judgment is absolutely binding upon the trial court, even in the face of any entitlement under Rule 60(b). Upon review of this case, the Court recognizes that, not only has Defendant somewhat overstated the holding of the case, there are several important factual distinctions between it and the present case. First and foremost, the Defendant mischaracterizes what the case stands for when she seemingly claims that a meritorious Rule 60(b) motion would be absolutely barred by the law of the case doctrine. Furthermore, the claim in the present case is in the form of an independent action for relief based on fraud upon the court, which is not a Rule 60(b) motion, as it based on the inherent power of the court not on the text of a rule.

In *MCA,* a shareholders' class action suit arising from the acquisition of a corporation was filed in Delaware. Another group of plaintiffs filed suit in federal court. Some of the federal plaintiffs would later file a motion to intervene so as to enable a Rule 60(b) motion in the Delaware court challenging the settlement. The Court of Chancery held that they were not permitted to intervene, and even if they were, would not have been entitled to relief from judgment. The Court's decision to deny intervention was based on the fact that the petitioners had the right to appear and object at fairness hearings, or to seek further review of the settlement at the state and national appellate levels. However, they chose to ignore the Delaware courts entirely. There was also an issue of the timeliness of the motions, as

petitioners sought to be involved seven years after the Delaware Supreme Court affirmed the Court of Chancery's approval of the settlement. In spite of the decision to deny the motion to intervene, the opinion goes on to discuss the merits of the arguments as a sort of courtesy to petitioners. It is in that section that the opinion discusses the law of the case doctrine, holding "I consider myself bound by the law of the case as to the question whether petitioners have been afforded due process of law on the adequacy of representation issue."[37] The law of the case doctrine was applicable in *MCA,* because in approving the settlement of the class action, the Delaware Supreme Court had implicitly affirmed the determination made by the Vice Chancellor regarding the adequacy of counsel. Therefore, petitioners could not use inadequacy of counsel as a reason for a much delayed Rule 60(b) motion.

The petitioners in the above case had multiple opportunities to object to the settlement in question, or to otherwise participate or appeal the decision of the Court of Chancery. Rather than participate, they made an active decision, likely for strategic reasons, to 'abjure' the courts of Delaware in favor of the pending litigation in federal court. It was only once that strategy did not resolve itself in their favor that they chose to make a motion to intervene seven years after the settlement. The opinion of the court also states that the petitioners have provided no conclusive evidence of fraud or misrepresentation, falling "far short of meeting Rule 60(b)(3)'s standard for fraud, misrepresentation or other misconduct necessary to vacate a judgment."[38] Instead, the Court noted that they had merely provided "sinister suspi-

---

**36.** 774 A.2d 272 (Del.Ch.2000).

**37.** *Id.* at 279.

**38.** *Id.* at 280.

cions and 'dark imaginings.' "[39] Finally, as noted above, that case was about a motion to intervene to file a Rule 60(b) motion, not about an independent action in equity or an independent action to set aside judgment based on fraud upon the court, as we have in the case at hand. The Court is not, therefore, persuaded by Defendant's citation to *In re MCA, Inc.*

Again, this is a new independent action, not the same case. The issue at the heart of Plaintiffs' claim, that fraud on the court was committed, was not briefed or decided in the prior case (at either the Superior or Supreme Court level). In fact, the majority of the information contained in this Complaint was not even known to the Plaintiffs at the time of the prior motion. Therefore, these are new issues, which this Court, as the original trial court, is not barred from hearing.

██ Defendants next attempt to support their motions to dismiss by attacking the merits of Plaintiffs claim of fraud on the court. According to Defendants, the allegations plead in Plaintiffs' Complaint do not constitute fraud on the court. Defendants cite four arguments in support of this position. First, Defendants claim that the alleged misconduct is not the type of "subversive" or "egregious" conduct that corrupts the judicial process, necessary to support a finding of fraud on the Court. In support of this premise, one Defendant points to the Delaware Supreme Court's opinion affirming the Superior Court's denial of the Motion to Vacate, which notes that "the facts of this case are not as 'egregious' as [Johnson] suggests." The Defendants go on to explain that, even if true, the allegations that the parties committed perjury, do not amount to fraud upon the court, and that the failure to produce the notes was due to Plaintiffs'

failure to make a document request of Montague.

Next, Defendants argue that the Complaint does not allege that the non-disclosure or alteration of the note by Dr. James prevented/hindered Johnson from making a valid negligence case. This is supported by Defendants' contention that Montague stated in her deposition that the jaundice extended below the nipple line, allegedly making whether the note said sternum or abdomen irrelevant.

Third, Defendants argue that the judgment in the prior case was rendered in favor of Montague because Plaintiffs failed to obtain an admissible expert opinion as to the standard of care of a physician's assistant. Finally, Defendants claim that Plaintiffs cannot establish that the courts were deceived as required (by some) for a finding of fraud upon the court.

The Supreme Court language pointed to by Defendants Turner and PJE, is not valid to support the argument. This Court, once again, points out that the pleadings and motions in the original case and the appeal did not contain the full extent of the alleged concealment, fraud and misrepresentations, because the Plaintiffs were not yet aware of them. The only party accused of fraud in the Motion to Vacate and Motion for Reargument was Montague. Thus, the Supreme Court's statement regarding the lack of egregiousness was in response only to the facts pled at that time. In the present case, there is not only far more detail, but more complex and serious allegations against not only Montague, but also the attorneys and the insurance company.

This Court fails to see how the alleged conduct, if true, would be deemed anything but egregious. It is alleged that Montague perjured herself, with her attorney's

39. *Id.*

knowledge. That attorney then, allegedly, not only purportedly suborned perjury, he discussed the existence of the Notes with Dr. James' attorney and with attorneys for the insurance company. Knowing full well how damaging this information could be to the case, Turner (and perhaps others) are alleged to have made a decision not only not to correct the false testimony, but to continue to rely upon it through, and including it in, the Motion to Vacate.

 Defendants have tried to describe this as some sort of discovery dispute between parties, or at most "mere perjury," which would generally not support a finding of fraud upon the court.[40] Had this case involved only the alleged fraud and misrepresentations by Montague, as originally used as the basis of the Rule 60(b) motion, it may well be that fraud on the court would not be found. Courts have held that fraud on the court is a concept that should be construed narrowly.[41] Even under the most narrow construction, however, the allegations in the present case would almost certainly fall within the definition of fraud on the court, if true. In support of this proposition, the Court looks back to the leading case in the area, *Hazel–Atlas*, discussed above. As noted by *Moore's Federal Practice*, "one of the distinguishing facts in the leading *Hazel–Atlas* case was the participation of a lawyer for one of the parties in the creation as well as the presentation of fraudulent evidence[.]"[42] Therefore, while "perjury by a witness will not suffice [to support a finding of fraud on the court], the involvement of an attorney, as an officer of the court, in a scheme to suborn perjury should certainly be considered fraud on the court."[43]

The case at hand is far more similar to the nature and extent of fraud present in *Hazel–Atlas*, than it is to any case of simple, traditional perjury by a witness. If Plaintiffs' allegations are true, two attorneys (one of whom was a member of the Delaware bar) allowed a witness to testify falsely, concealed evidence, used the perjured testimony as support for later filings, and possibly conspired with the insurance company to keep the evidence secret. This is exactly the kind of behavior that does or attempts to "defile the Court itself." Of course, as will be discussed further below, a finding must be made that Plaintiffs' allegations are supported by clear and convincing evidence.[44] Defendants will also be afforded the opportunity to appear and be heard, since they certainly deny many aspects of the allegations.

Defendant Montague next argues that, even if this Court decides all the aforementioned disputes in Plaintiffs' favor, the claim must still fail as prejudice must be demonstrated for the judgment to be set

**40.** *Moore's Federal Practice*, § 60.21[4][c].

**41.** *Smith v. Williams*, 2007 WL 2193748 (Del.Super. July 27, 2007).

**42.** § 60.21[4][b].

**43.** *Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir.1987) (quoting *Great Coastal Express, Inc. v. International Bhd. Of Teamsters*, 675 F.2d 1349, 1357 (4th Cir.1982)); See also *Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir.1972)("While an attorney should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the Court. And when he departs from that standard in the conduct of a cause he perpetrates a fraud upon the Court." [quoting Moore's (1971 ed.) ] ); *H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1119 (6th Cir.1976)("Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court.").

**44.** *Smith v. Williams*, 2007 WL 2193748 (Del.Super. July 27, 2007).

aside. In support of this argument, Montague cites to two cases. The first is *Pitts v. White.* This case does not involve an independent action for fraud or the court, or fraud under Rule 60(b)(3).[45] Instead, it involved a motion under Rule 60(b)(6). The other case is *In Re Estate of Alexander.*[46] It is an Ohio case involving a Rule 60(b)(5) motion (equivalent to Delaware Rule 60(b)(6)), to vacate the settlement of an estate based on the attorney's fraud. The Court found that the attorney's misconduct did not make the overall settlement a problem and chose not to vacate. These cases should be weighed against those presented by the Plaintiffs in support of their position that they do not need to prove prejudice in order to succeed.

Plaintiffs cite to several cases in their Answering Brief in Opposition to Defendant Montague's Motion to Dismiss. In short, these cases stand for the proposition that, in an independent action for fraud on the court, the focus is on the harm to the judicial system, not prejudice or harm caused to the individual litigants. Furthermore, even if Plaintiffs were required to prove prejudice, the allegations in the Complaint satisfy that requirement. Plaintiffs have argued that, were they aware of the existence of the Original Notes, they would likely have been able to secure a more qualified expert. Plaintiffs specifically mention the fact that the expert they chose was the one most willing to provide an opinion in their favor. Had they been aware of the alterations to the medical record, they contend they could have secured a qualified expert in their favor. There is also an argument to be made with regard to the latitude the Court was willing to provide in the prior case.

One could certainly speculate that, had the Court been aware of the allegations of misconduct and fraud at the time, Plaintiffs might have been allowed additional leeway in obtaining an expert.

While that is not a strong point in Plaintiffs' Complaint, at the motion to dismiss stage, the threshold it must meet is low. The purpose, of course, is to allow Plaintiffs further time in discovery to flesh out the allegations. Additionally, further development may provide that Plaintiffs do not need to meet the burden of demonstrating prejudice, needing only to show that the integrity of the justice system was harmed.

As discussed above, the nature and extent of these allegations against counsel, parties and the insurance company, rise to the level of a wrong against the institution.

Defendants next argue that the negligence of Plaintiffs' own attorney, in failing to secure an adequate expert opinion, supports the dismissal of count one. Defendants base this argument on the idea that this is an equitable claim, which must be dismissed if the party caused its own harm. As clearly stated by *Moore's Federal Practice:* "Because fraud on the court is concerned with the integrity of the adjudication process itself, it should be irrelevant whether the party seeking relief has 'clean hands' or not." [47] Accordingly, Defendants' argument on this topic is unpersuasive.

The Defendants' last argument is based on a citation to a Northern District of New York Case, *Weldon v. United States.*[48] Defendants argue that this case stands for the proposition that a prior Rule 60(b) motion will bar a later action for fraud on

---

**45.** 111 A.2d 217 (Del.1955).

**46.** 92 Ohio App.3d 190, 634 N.E.2d 670 (1993).

**47.** *Moore's Federal Practice,* § 60.21[4][f].

**48.** 845 F.Supp. 72 (N.D.N.Y.1994).

the court where the plaintiff had the full and fair opportunity to litigate the issue in the prior proceeding. This case and the argument fail. In the prior proceeding Plaintiffs did not have an opportunity to address the conduct fully, because they did not yet have the adequate information or time to respond. More importantly perhaps, is the fact that neither Court in the prior proceeding confronted the issue of whether there was fraud on the court. Those decisions held that, as the case had been dismissed due to Plaintiffs inability to secure a satisfactory expert, consideration was not needed one way or the other regarding fraud on the court. However, at those stages, Plaintiffs did not have the full spectrum of alleged misconduct before this Court now.

There are two final points on this topic that are significant. Case law provides that "a finding of fraud on the court must be supported by clear, unequivocal, and convincing evidence."[49] It also appears based on *Moore's Federal Practice* and other case law that a hearing will be necessary. *Moore's* states in pertinent part:

There are no formal requirements for asserting a claim of fraud on the court. However, the United States Supreme Court has made it clear that a judgment may not be set aside on these grounds without affording all parties who might be affects by its action the right to appear and be heard ... At the very least, this means not only notice and an opportunity to be heard, but also that the fact-finding be based on testimony that is subject to examination and cross-examination.[50]

### Count Two: Montague Re–Trial

If the Court sets aside the prior dismissal of Plaintiffs' case against Montague in the event that judgment ultimately sustains Plaintiffs' fraud and related claims, then their claims against Montague could proceed. Hence, Defendants' Motions with regard to Count two are **DENIED.**

### Counts Three, Four and Five: Conspiracy

▆▆▆▆▆ Counts three, four and five allege intra-, pre- and post-litigation civil conspiracy. Defendants contend that the allegations contained in the Complaint do not support a civil conspiracy claim. Specifically, Defendants argue that the Complaint does not allege any actionable underlying independent tort, nor actual damages. To establish a valid claim for civil conspiracy, a plaintiff must prove "(1) A confederation or combination of two or more persons; (2) An unlawful act done in furtherance of the conspiracy; and (3) Actual damage."[51] In Delaware, "civil conspiracy is not an independent cause of action ... it must arise from some underlying wrong."[52]

Defendants' Motions to Dismiss set forth several arguments in support of their contention that Counts three, four and five should be dismissed. Defendants Turner, Montague and PJE contend that Counts three and five fail as the Complaint allegedly does not plead a cognizable underlying claim to support civil conspiracy. They further argue that, even if the allegations were true, Plaintiffs have not established damages. Defendant Montague

---

**49.** *Smith v. Williams*, 2007 WL 2193748 (Del.Super. July 27, 2007).

**50.** *Moore's Federal Practice*, § 60.21[4][f] (pg. 60–65).

**51.** *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del. April 30, 1987) (citing *McLaughlin v. Copeland*, 455 F.Supp. 749, 752 (D.Del.1978), aff'd, 595 F.2d 1213 (3d Cir.1979)).

**52.** *Ramunno v. Cawley*, 705 A.2d 1029, 1030 (Del.1998).

also challenges the validity of Count four on the same grounds. In addition, Defendants Turner and PJE, once again, raise the *Noerr–Pennington* doctrine as grounds to bar Counts three and five.

Defendants argue that Plaintiffs' civil conspiracy claims must fail as they do not allege a valid independent tort necessary to support the claims. Specifically, Defendants contend that the conspiracy allegations fail to state an actionable independent tort. However, review of the Complaint demonstrates allegations sufficient to support civil conspiracy claims. Delaware case law has provided that the independent tort of intentional misrepresentation is sufficient to satisfy the requirements of an underlying wrong.[53] The Complaint adequately pleads intentional misrepresentation, particularly when viewed in light of the "low threshold for the showing a plaintiff must make to survive a motion to dismiss." [54] In addition to intentional misrepresentation, the independent tort of fraud, which is also alleged in Plaintiffs' Complaint, is sufficient to serve as the basis of the claims for civil conspiracy.

■ Defendants have also raised the question of whether Plaintiffs' Complaint establishes damages, which are essential to the torts of civil conspiracy and fraud. Defendants argue that, even if the factual allegations of the Complaint are accepted as true, Plaintiffs have not established harm as a result of the concealment/non-disclosure of the notes. The Defendants specifically point to the fact that Montague admitted in her deposition that the jaundice extended below the nipple line. They claim (again) that whether the note said

sternum or abdomen does not matter, because of what was stated in the deposition. The standard a plaintiff must meet at the motion to dismiss stage is low. Plaintiffs' Complaint meets this standard. With that said, perhaps some additional attention should be given to this issue. It is not clear at this juncture what harm the concealment caused, in the sense that, to some degree, Plaintiffs' counsel was responsible for the dismissal for failure to get an qualified expert. Plaintiffs may address this section of their claim in order to survive ultimately.

■ Finally, Defendants Turner and PJE argue that the *Noerr–Pennington* doctrine provides immunity, barring suit. The *Noerr–Pennington* doctrine is derived from two United States Supreme Court cases: *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Simply put, the *Noerr–Pennington* doctrine stands for the proposition that:

> [a] party who petitions the government for redress generally is immune from antitrust liability. Commonly referred to as the *Noerr–Pennington* doctrine, this immunity extends to persons who petition all types of government entities, including legislatures, administrative agencies, and courts. Although originally developed in the antitrust context, courts have applied this doctrine universally to business torts.[55]

It seems quite clear to this Court that the activity complained of in this case does not fall within the *Noerr–Pennington* doc-

---

53. *Nicolet, Inc. v. Nutt*, 525 A.2d 146 (Del. 1987).

54. *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).

55. *Arthrocare Corp. v. Smith & Nephew, Inc.*, 2004 WL 896002, at *3 (D.Del. March 10, 2004).

trine. The doctrine was definitely not aimed at allowing attorneys and their clients to deceive the courts and opposing parties intentionally, through an alleged conspiracy to hide evidence and suborn perjury. In *Noerr*, railroad companies joined together to engage in a lobbying campaign to attempt to influence the passage of state laws relating to taxes and weight limits of heavy trucks. Several trucking companies filed suit against the railroads claiming that their allegedly deceptive (and successful) lobbying campaign constituted a violation of the antitrust laws. In reversing the judgment against the railroads, the United States Supreme Court held that the Sherman Antitrust Act does not prohibit two or more persons from associating together in an attempt to persuade the legislative or executive to take particular action with respect to a law that would produce a restraint or a monopoly, as such a reading would raise important First Amendment concerns.[56]

Not only is the present case clearly inapposite to the *Noerr–Pennington* case law, but also, even if the doctrine were applicable, the conduct alleged would fall within an exception. The exception for sham litigation is best explained as: "activity ostensibly directed toward influencing governmental action does not qualify for *Noerr* immunity if it is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor."[57] Although the United States Supreme Court has not yet addressed the existence of a fraud exception to the *Noerr–Pennington* doctrine, some other courts have recognized that such an exception does exist in limited circumstances. For example, in *Cheminor Drugs, Ltd. v. Ethyl Corp.*, the Third Circuit recognized a fraud exception to Noerr.[58] In that case, the Court explained that material misrepresentations affecting "the very core of a litigant's ... case will preclude *Noerr–Pennington* immunity."[59]

Furthermore, in *California Motor Transport Co. v. Trucking Unlimited*, the United States Supreme Court explained the very important distinction between political expression and abuse of judicial process through the utilization of misrepresentations or baseless suits.[60] The Court held that alleged unethical conduct in the course of political activity or petitioning the executive or legislative branches, which is protected by *Noerr*, is distinct from unethical conduct in the judicial setting. The Court goes on to state that: "[t]here are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes ... Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."[61]

For the forgoing reasons, Defendants' Motions to Dismiss as to Counts three, four and five are **DENIED**.

### Counts Six, Seven, Ten and Twelve: Fraud

Counts six, seven, ten and twelve of Plaintiffs' Complaint assert claims of fraud against PPIC, Turner and Montague, respectively.

---

**56.** 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

**57.** *Professional Real Estate Investors v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 51, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

**58.** 168 F.3d 119 (3rd Cir.1999).

**59.** *Id.*

**60.** 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

**61.** *Id.* at 513, 92 S.Ct. 609.

The elements of common law fraud (or deceit) are:

"(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." [62]

Though this was not a topic specifically addressed in briefing, it would appear that common law fraud and intentional misrepresentation are essentially the same things.[63] Thus, having plead both of them separately would be duplicative. Hence, all of the arguments discussed for Counts 9, 11, and 13 are applicable here as well.

### Counts Nine, Eleven and Thirteen: Intentional Misrepresentation

 Counts nine, eleven and thirteen of Plaintiffs' Complaint allege intentional and negligent misrepresentation against PPIC, Turner and Montague respectively. Negligent misrepresentation is another name for equitable fraud. Common law fraud consists of five elements:

(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made

with reckless disregard of the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[64]

"The only difference between common law fraud and equitable fraud is that equitable fraud does not include element(2)." [65] The Court of Chancery has exclusive jurisdiction over claims of equitable fraud, which is also known as negligent or innocent misrepresentation.[66] To the extent that Plaintiffs' claims do not have any foundation of Defendants' knowledge of falsity, they cannot be heard in this Court. That does not appear to be significant in this case. The claims dealing with intentional misrepresentation are within this Court's jurisdiction, and may remain.

 To establish a claim for intentional misrepresentation, the following elements are required: "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) Defendants' acting with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." [67]

Defendants argue that Plaintiffs fail to meet these requirements. More specifically, Defendant Montague's Opening Brief

**62.** *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del.1992)(citing *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

**63.** 37 Am.Jur.2d Fraud and Deceit Section 7 ("an international misrepresentation is generally an element of fraud, although the terms 'fraud' and 'intentional misrepresentation' are often used interchangeably in common parlance.") See, for instance, *Smyrna Hospitality, LLC v. Petrucon Construction, Inc.*, 2013 WL 6039287 (Del.Super. September 27,

2013); *Iacono v. Barici*, 2006 WL 3844208 (Del.Super. December 29, 2006).

**64.** *Radius Services, LLC v. Jack Corrozi Const., Inc.*, 2009 WL 3273509 (Del.Super.2009).

**65.** *Id.*

**66.** *Id.*

**67.** *Strong v. Wells Fargo Bank*, 2012 WL 3549730, at *2 (Del.Super. July 20, 2012)(quoting *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del.1987)).

argues that the claim against her cannot stand, because the material fact alleged to have been concealed was discussed by Montague in her deposition. In support of this argument, Defendant cites to portions of her deposition testimony. While it is certainly true that Montague discussed the location of the yellowing of Johnson's skin in that deposition, the alleged misrepresentations go beyond that. In raising this argument for dismissal, Defendant Montague has selectively chosen some facts, ignoring the broader issues Plaintiffs have raised. Montague may have discussed the yellowing in the deposition, but she failed to relate the existence of relevant documents, and denied the existence of further documents in the very same deposition. Furthermore, these misrepresentations allegedly and apparently were all part of a broader intentional misrepresentation alleged to have been made by the Defendants acting in concert: the concealment of Office Notes indicating the apparent misdiagnosis of Johnson's condition.

Defendants have also, again, raised *Noerr–Pennington* as a defense to these claims. That issue was discussed in reference to Counts 3, 4, and 5.

For the forgoing reasons, particularly when viewed in light of the low threshold required to survive a motion to dismiss, Defendants' Motions to Dismiss Counts nine, eleven and thirteen are **DENIED.** However, the portions of the claims pertaining to negligent misrepresentation must either be dismissed or transferred to the Court of Chancery, which has exclusive jurisdiction over that particular cause of action.

*Count Fourteen:*

 The allegations set forth in support of Plaintiffs' RICO claim against PPIC, do not under any conceivable reading, amount to a valid RICO claim. In order to present a valid RICO claim, the injured party must demonstrate that Defendants engaged in a "pattern of racketeering activity." [68] This requires demonstration of two sets of racketeering activity within ten years of each other. [69] These acts must be related, and must pose a threat of continued criminal activity. [70] This second requirement is further broken down into two types of criminal activity that can be shown. The first is criminal activity, involving past criminal conduct over a substantial period of time. [71] The second is open ended, involving past conduct plus a threat of future criminal activity. [72]

·The conduct alleged in Plaintiffs' Complaint does not fit into either of these categories. While related, the alleged activity is clearly not the type that poses a future threat of continued criminal activity. Further support for the finding that RICO does not apply under the circumstances presented in this matter comes from the Delaware Court of Chancery. In *Iotex Communications, Inc. v. Defries,* the Court granted a motion to dismiss holding: "[f]irst the predicate acts that Iotex rely on all arise out of or are related to the same transaction ... [and that] the predicate acts allegedly injury only one party, Iotex itself ... [and] [l]astly, the alleged injury itself is a single injury." [73] Arguably, each of these findings could be said about the case at hand, as well. For these

**68.** 10 Am.Jur. Proof of Facts 3d 289 (Originally published in 1990).

**69.** *Id.*

**70.** *Id.*

**71.** *Id.*

**72.** *Id.*

**73.** 1998 WL 914265 (Del.Ch.1998).

reasons, Plaintiffs' claim under Count XIV
is **DISMISSED.**

 **SO ORDERED.**

