IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GMG INSURANCE AGENCY, | § | |
| | § | No. 213, 2023 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. N21C-07-002 |
| MARGOLIS EDELSTEIN, | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: July 10, 2024
Decided: October 8, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **REVERSED AND REMANDED**.

Michael R. Ippoliti, Esquire (*argued*), Christopher Isaac, Esquire, Ippoliti Law Group, Wilmington, Delaware, *for Appellant GMG Insurance Agency*.

Sally J. Daugherty, Esquire, Salmon, Ricchezza, Singer & Turchi, LLP, Wilmington, Delaware, and George M. Vinci, Jr., Esquire (*argued*), David B. Picker, Esquire, Spector Gadon Rosen Vinci P.C., Philadelphia, Pennsylvania, *for Appellee Margolis Edelstein*.

**GRIFFITHS**, Justice, for the Majority:

This appeal arises from a claim of professional negligence relating to legal services that appellee Margolis Edelstein provided to appellant GMG Insurance Agency. Margolis defended GMG and Howard Wilson, a GMG employee, in a non-compete action brought by Lyons Insurance Agency, Inc. in the Court of Chancery. After GMG failed to prevail fully on its motion for summary judgment in the Court of Chancery, GMG fired Margolis. Around the same time, GMG also fired Wilson. On the eve of trial, with GMG represented by new counsel and Wilson represented by separate counsel, Wilson filed an affidavit recanting his prior testimony. Wilson's new sworn statements were drastically inconsistent with his prior testimony and unfavorable to GMG. GMG requested a continuance from the Court of Chancery to seek discovery on Wilson's changed statements, but the court denied that request. Instead of proceeding to trial, GMG settled its part of the litigation for $1.2 million. The trial still went forward as to Wilson.

After the Court of Chancery action concluded, GMG filed a legal malpractice claim against Margolis in the Superior Court. There, GMG asserted that but for Margolis's negligent representation in the Court of Chancery, GMG would not have been exposed to the consequences of Wilson's eleventh-hour change in testimony. The Superior Court granted summary judgment in favor of Margolis on GMG's professional negligence claim, finding that Margolis's representation did not fall

2

below the applicable standard of care and that, in any event, Wilson's eleventh-hour affidavit recanting prior testimony was a superseding cause that broke the causal chain linking Margolis's alleged negligence and GMG's claimed damages. We hold that this decision was in error because there are material disputed facts as to whether Margolis deviated from the requisite standard of care. The court also erred by failing to address GMG's contention that, but for Margolis's alleged negligence, GMG would have prevailed on all claims in the Court of Chancery litigation. And, finally, the Superior Court erred by concluding that Wilson's affidavit was a superseding cause as a matter of law. Accordingly, we reverse the judgment of the Superior Court and remand for further proceedings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *Howard Wilson's Employment Background and the USI Litigation*

Over the past decade, Howard Wilson has worked at a few insurance agencies. He was employed by USI Insurance Services in 2014. In July 2014, Wilson resigned from USI and joined Lyons Insurance Agency with the understanding that he would bring his customer relationships from USI to Lyons. About three-quarters of his clients followed him from USI to Lyons. Wilson, however, was bound by a non-compete agreement with USI, of which Lyons was aware.

---

[1] The following undisputed facts are drawn from the record below, as well as from the record in the underlying litigation in the Court of Chancery. *See* C.A. No. 2017-0092 [hereinafter "Ch. Dkt. __ at __."].

3

USI sued Wilson and Lyons in Pennsylvania state court to enforce Wilson's non-compete obligations. On August 8, 2014, the Pennsylvania court issued a two-year injunction against Lyons and Wilson, prohibiting them from servicing any clients that moved with Wilson from USI to Lyons. In July 2016, one month before the injunction was to end, some of Wilson's former clients changed brokers to GMG. On July 18, 2016, Lyons and USI settled, ending the litigation. The court subsequently lifted the injunction and USI's non-compete rights ended.

With the injunction lifted, Lyons instructed Wilson to solicit back his former clients. Wilson contacted his largest former client—OTG Management Inc.—to gauge its interest in switching brokers. At the time, OTG was serviced by GMG. OTG was not interested in moving its business. At that point, Wilson struggled to bring in business to Lyons and felt that his career was in balance. After taking a vacation in late July 2016, Wilson resigned from Lyons and joined GMG, with whom he had been in talks while still employed by Lyons. Wilson, however, was bound by a non-compete agreement with Lyons that was still in effect at the time GMG hired him.

*B. The Court of Chancery Litigation*

On February 7, 2017, Lyons sued Wilson and GMG in the Court of Chancery seeking injunctive relief and money damages (the "Chancery Litigation").[2] Lyons claimed that Wilson's employment with GMG breached his non-compete agreement with Lyons, and that GMG aided and abetted that breach and tortiously interfered with the agreement between Lyons and Wilson. GMG retained Margolis Edelstein to represent itself and Wilson in the Chancery Litigation.

On February 28, 2017, the Court of Chancery granted Lyons's motion to expedite, and the parties pursued discovery before a hearing on Lyons's preliminary injunction motion. During that discovery period, in April 2017, Margolis attorneys internally confided that they were "wholly inexperienced" and "ill-equipped" to handle discovery in the Court of Chancery.[3] Eventually, on July 12, 2017, the court refused to issue a preliminary injunction, and both sides took additional discovery.

On February 23, 2018, Lyons filed a renewed motion for summary judgment on three counts, and GMG and Wilson moved for summary judgment on all counts. On September 28, 2018, the Court of Chancery granted summary judgment in favor

---

[2] Lyons brought the following causes of action: (i) breach of contract (against Wilson); (ii) breach of the duty of good faith and fair dealing (against Wilson); (iii) quantum meruit (against Wilson); (iv) aiding and abetting (against GMG); (v) unjust enrichment (against Wilson and GMG); (vi) civil conspiracy (against Wilson and GMG); and (vii) tortious interference with contract and prospective economic relations (against GMG). *See* Ch. Dkt. 1 at ¶¶ 53–94 (Chancery Compl.).

[3] App. to Answering Br. at B50, B53.

of GMG on all counts except for Lyons's tortious interference claim. The court also held that Wilson had breached his non-compete agreement with Lyons. As to the surviving claim against GMG, the Court of Chancery held that "the factual record [was] not sufficiently developed as to whether GMG's actions satisf[ied] the remainder of the tortious interference requirements."[4]

After the Court of Chancery's ruling, the parties engaged in mediation. During this time, Margolis advised GMG to settle the litigation but also expressed its willingness to take additional discovery and proceed to trial. After mediation proved unsuccessful, GMG terminated Margolis. GMG then hired Smith, Katzenstein & Jenkins LLP as replacement counsel. Around the same time, GMG fired Wilson. It also informed Wilson that he would need to seek representation by separate counsel.

During the ensuing months, GMG's new counsel constructively conferred with Lyons and produced additional documents. In June 2019, GMG made additional document productions to cure earlier deficiencies. GMG produced documents—which were not produced in the early stages of litigation in 2017—

---

[4] *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *8 (Del. Ch. Sept. 28, 2018) [hereinafter "*Chancery Opinion*"]. To prevail on a claim of tortious interference, a party must show that: "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury." *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (citation omitted). The Court of Chancery noted that while it found that "[Wilson's non-compete agreement with Lyons was] a valid contract, and Wilson [wa]s in breach[,]" the record was not developed as to the other elements. *Chancery Opinion* at *8.

6

tending to show that its partners had relied on the advice of counsel when considering whether to hire Wilson in light of his non-compete obligations. Following the production, Lyons moved for sanctions, arguing that "[b]ut for wrongful withholding of evidence . . ., the tortious interference count would have been resolved at summary judgment" because the "the newly-disclosed, wrongfully withheld evidence" revealed "pre-planning [of] Mr. Wilson's hiring in connection with GMG's obtaining the business of Lyons'[s] clients or prospects."[5]

Although the Court of Chancery deferred deciding on an appropriate sanction until after trial, it acknowledged the significance of the newly produced discovery, noting that the information should have "clearly" been produced, given its "extraordinar[y] importan[ce]" to the underlying theories of the case.[6] The court also recognized that the information could have affected the court's resolution of the summary judgment motion. On June 29, 2020, the parties informed the Court of Chancery that in light of the court's ruling on Lyons's sanctions motion, Lyons would forgo supplemental depositions and proceed to trial on the outstanding issues. On December 8, 2020—two days before trial was scheduled to begin—GMG's counsel informed the Court of Chancery of a late-breaking development in the case:

> Today, I learned from counsel for co-defendant Howard
> Wilson that Mr. Wilson intends to testify at trial on

---

[5] Ch. Dkt. 145 at ¶¶ 1, 4(a) (Lyons's Motion for Sanctions).

[6] Ch. Dkt. 158 at 26:20, 24 (Motion for Sanctions Hrg. Tr.).

7

Thursday to the existence of an agreement between himself, my client and third party OTG to have OTG remain as a client with GMG after the plaintiff in this matter was able to extricate itself and Wilson from the USI injunction. *This position is directly contrary to my client's position and Mr. Wilson's position prior to today*.[7] In addition, this testimony would mean that Mr. Wilson committed perjury in his prior testimony in this case. I have also learned from Mr. Wilson's counsel that his client apparently will testify that not only was my client involved, but that OTG's general counsel and its retired CFO were also parties to this agreement. As a result of this very new development, and despite our client's strongly held desire to bring this litigation to an end as soon as possible, we respectfully ask for a short continuance of the trial so that Mr. Wilson's new version of events can be reduced to an affidavit which can then be shown to OTG's general counsel and former CFO at a deposition. I expect that we can complete the tasks in less than 60 days.[8]

That same day, the court denied GMG's continuance request and ordered the "[t]rial to proceed as scheduled."[9] The next day, Wilson filed an affidavit

---

[7] This statement of GMG's position is consistent with what it wrote three weeks earlier in its opening pretrial brief: "Contrary to Lyons'[s] allegations and insinuations throughout this litigation, however, there was never an agreement or an understanding between Wilson and GMG for OTG to be 'parked' at GMG until Wilson could be extricated from the USI litigation and his employment with Lyons. More importantly, there is no evidence that such an arrangement exists. . . . From the inception of its discussions with Wilson about possible employment in 2016 through the entire time he was employed, GMG emphasized to Wilson its desire that he not do anything that could be viewed as a violation of his ongoing legal obligations to Lyons." Ch. Dkt. 165 at 6 (GMG's Opening Pre-trial Brief). Notably, Wilson "adopt[ed] and incorporate[d]" this statement in his opening pretrial brief. Ch. Dkt. 164 at 2 (Wilson's Pre-trial Brief).

[8] Ch. Dkt. 182 (December 8, 2020 Letter from Laurence V. Cronin, Esq., to the Honorable Sam Glasscock, III) (emphasis added).

[9] Ch. Dkt. 184 (Judicial Action Form).

8

"disavow[ing] and recant[ing] any prior sworn testimony inconsistent with" his new affidavit (the "Wilson Affidavit").[10] In the Wilson Affidavit, in direct contravention of his prior testimony, Wilson stated that he, GMG, and OTG had participated in a series of meetings and phone calls in late 2015 and early 2016, during which they agreed that OTG would change brokers to GMG. He also stated that they collectively agreed that GMG would hire Wilson to service OTG and other clients as soon as the USI injunction ended. Shortly thereafter, Lyons and GMG informed the court that they had reached a settlement in principle and that the trial would move forward only as to the causes of action remaining against Wilson. GMG paid $1.2 million to settle the claims against it in the Chancery Litigation.

*C. The Superior Court Litigation*

On July 1, 2021, GMG sued Margolis for legal malpractice in the Superior Court, claiming that its attorneys "negligent[ly] deviat[ed] from the standard of care expected of lawyers licensed to practice" in Delaware.[11] Margolis answered GMG's complaint on September 17, 2021, and discovery ensued. On March 22, 2022, Margolis moved for summary judgment on all of GMG's claims.

---

[10] *See* App. to Answering Br. at B199.

[11] *Id.* at B22 (Compl. ¶ 115).

9

The Superior Court granted Margolis's motion for summary judgment on April 10, 2023.[12] As to the underlying allegations of negligence, the Superior Court held that Margolis did not breach the standard of care owed by a Delaware attorney in developing the factual record or in presenting GMG's motion for summary judgment on Lyons's tortious interference claim in the Chancery Litigation because GMG prevailed on all the other causes of action at the summary judgment stage.[13] The court also concluded that the Wilson Affidavit was a superseding cause that broke the causal chain leading to the settlement of the Chancery Litigation.[14] In other words, Margolis's negligence was not the cause of GMG's harm—the Chancery Litigation settlement—because an intervening, superseding cause—the Wilson Affidavit—broke the causal link between the negligence and the harm. Thus, according to the Superior Court, GMG's claim against Margolis failed.

GMG appealed the Superior Court's summary judgment decision on June 14, 2023. On April 19, 2024, a three-judge panel of this Court reversed and remanded the Superior Court's decision. On May 3, 2024, Margolis filed a motion for reargument and a motion for rehearing *en banc*. We granted Margolis's motion for

---

[12] *GMG Ins. Agency v. Margolis Edelstein*, 2023 WL 2854760 (Del. Super. Apr. 10, 2023) [hereinafter "*Superior Court Opinion*"], *reargument denied*, 2023 WL 3522297 (Del. Super. May 17, 2023).

[13] *Id.* at *4.

[14] *Id.*

10

rehearing *en banc*, vacated our prior decision, and held oral argument on July 10, 2024.[15]

## II.    STANDARD OF REVIEW

We review the Superior Court's decision on a motion for summary judgment *de novo*, applying the same standard as the trial court.[16]  A motion for summary judgment will be granted on a claim when the moving party shows "that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[17]  We must determine whether, considering the facts and inferences in the light most favorable to the non-movant, any genuine issue of material fact existed for the jury to resolve.[18]  "[A] defendant moving for summary judgment has the burden of producing evidence of necessary certitude demonstrating that there is no genuine issue of fact relating to the question of negligence and that the proven

---

[15]    *Delaware Supreme Court Internal Operating Procedures* § XVII(4), https://courts.delaware.gov/forms/download.aspx?id=117538 (last visited Sept. 30, 2024) ("*Rehearing granted.*  If a majority of the active justices of the Court vote for rehearing *en banc*, the named author or ranking active Justice of the majority enters an order which grants rehearing, vacates the panel's opinion and the judgment entered thereon, and assigns the case to the calendar for rehearing *en banc* on a priority basis."); *see also GMG Ins. Agency v. Edelstein*, 2024 WL 3159830 (Del. May 10, 2024) (ORDER) (granting motion for rehearing *en banc*, vacating April 19, 2024 decision, and scheduling oral argument for July 10, 2024).

[16] *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009) (citing *Berns v. Doan*, 961 A.2d 506, 510 (Del. 2008)).

[17] Del. Super. Ct. Civ. R. 56(c).

[18] *See Jones v. Crawford*, 1 A.3d 299, 301–02 (Del. 2010) (citing *Williams v. Geier*, 671 A.2d 1368, 1375 (Del. 1996)); *see also Ogden v. Gallagher*, 591 A.2d 215, 221 (Del. 1991) (citing *Benge v. Davis*, 553 A.2d 1180, 1182 (Del. 1989)).

facts preclude the conclusion of negligence on its part."[19] If "genuine factual issues" that "may reasonably be resolved in favor of either party" remain, summary judgment must be denied so that the issues can be properly resolved at trial.[20] There is no absolute right to summary judgment.[21]

## III. ANALYSIS

To prevail on a claim of legal malpractice, a plaintiff must establish the following elements: (i) the employment of the attorney; (ii) the attorney's neglect of a professional obligation; and (iii) resulting loss.[22] Regarding the last element, "the plaintiff must demonstrate that the underlying action would have been successful but for the attorney's negligence."[23]

We conclude that the Superior Court erred in three ways. First, the Superior Court erred in granting summary judgment for Margolis because there are disputes of material fact as to whether Margolis's representation of GMG in the Chancery Litigation breached the standard of care owed by Delaware attorneys. Second, the

---

[19] *Hazel v. Delaware Supermarkets, Inc.*, 953 A.2d 705, 709 (Del. 2008) (internal quotations and citation omitted).

[20] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[21] *See AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005) (citing *Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969)).

[22] *See Flowers v. Ramunno*, 27 A.3d 551, 2011 WL 3592966, at *2 (Del. Aug. 16, 2011) (TABLE) (citing *Weaver v. Lukoff*, 511 A.2d 1044, 1986 WL 17121, at *1 (Del. July 1, 1986) (TABLE)); *see also Lorenzetti v. Enterline*, 44 A.3d 922, 2012 WL 1383186, at *2 (Del. Apr. 18, 2012) (TABLE) (citations omitted).

[23] *Flowers*, 2011 WL 3592966, at *2 (citation omitted).

court erred by failing to address GMG's contention that, but for Margolis's alleged negligence, GMG would have prevailed on all claims in the Chancery Litigation. Third, the Superior Court erred in concluding as a matter of law that the Wilson Affidavit was a superseding cause that broke the causal chain leading to the settlement of the Chancery Litigation.

### A. There are genuine disputes of material fact as to whether Margolis breached the standard of care in the Chancery Litigation.

The Superior Court erroneously ruled that "[t]here is no reason to conclude that [Margolis's] actions breached the standard of care in developing the factual record, or when presenting the [Court of Chancery motion for summary judgment] on the tortious interference issue."[24]  To prove negligence, GMG is required to establish by a preponderance of the evidence that Margolis failed to meet its legal standard of care and that Margolis's misconduct proximately harmed GMG; that is, GMG "must prove the elements of duty, breach, causation, and harm."[25]  "Trial judges generally will not grant summary judgment on negligence issues, but will submit those issues to the jury."[26]

---

[24] *Superior Court Opinion* at *4.

[25] *Jones*, 1 A.3d at 302 (citations omitted).

[26] *Id.* at 303 (citing *Ebersole v. Lowengrub*, 180 A.2d 467, 469 (Del. 1962)).

13

In response to Margolis's motion for summary judgment, GMG cited record evidence supporting its allegation that Margolis was negligent in its representation of GMG in the Chancery Litigation.[27] GMG claimed that because Lyons's tortious interference claim survived summary judgment in the Court of Chancery, GMG incurred significant damages in the form of fees and costs and the $1.2 million settlement, which, but for Margolis's negligence, would not have been incurred.[28] And the Superior Court recognized GMG's contention that, if Lyons's tortious interference claim had not survived summary judgment in the Chancery Litigation, then GMG "would not have been in a position to be negatively affected by the Wilson Affidavit."[29] Yet the court did not squarely address this allegation.

Instead, bypassing the Court of Chancery's acknowledgement of the potential effect of Margolis's discovery deficiencies on the summary judgment proceedings, the Superior Court pointed to Margolis's success on the claims that were dismissed:

> The Court of Chancery granted summary judgment in favor of [GMG] on the issues of aiding and abetting, unjust enrichment, and civil conspiracy. This ruling alone

---

[27] *See* App. to Opening Br. at A83–86 (GMG's Opposition to Margolis's Motion for Summary Judgment).

[28] *See id.* at A30 (Compl. ¶ 121) ("But for [Margolis's] aforementioned deviations from the applicable standard of care, GMG would not have incurred significant money damages, including: a [$1.2 million] settlement payment to Lyons; $165,150.23 incurred in attorneys' fees paid to [replacement counsel]; and significant losses of revenue [in 2018][.]").

[29] *Superior Court Opinion* at *3 (quoting App. to Opening Br. at A89 (GMG's Opposition to Margolis's Motion for Summary Judgment)).

14

evidences the competence and diligent representation of [GMG] by [Margolis] prior to termination.[30]

Below, we explain why this holding was erroneous. GMG proffered record evidence supporting a finding that Margolis breached the standard of care for a Delaware attorney during the Chancery Litigation in three ways: (1) by failing to competently handle discovery and develop the record, documented in part by Margolis's contemporaneous internal emails; (2) by failing to adequately brief and argue in favor of dismissing Lyons's tortious interference claim, shown by Margolis's conclusory or non-existent discussion of that claim in its submission to the Court of Chancery; and (3) by simultaneously representing GMG and Wilson despite a potential conflict of interest, which may have hindered Margolis's ability to appropriately counsel GMG. We address each category in turn.

> 1. *There is a genuine dispute of material fact as to whether Margolis breached the standard of care owed by a Delaware attorney by failing to produce certain documents or adequately develop the record in the Chancery Litigation.*

GMG argues that Margolis committed malpractice by mishandling the discovery process, including by failing to develop the requisite factual record that would have allowed GMG to prevail at summary judgment on Lyons's tortious interference claim. Specifically, GMG alleges that Margolis breached its duty of care by failing to produce critical documents in the early stages of the Chancery

---

[30] *Id.* at *4 (citation omitted).

Litigation in 2017 (which were later produced by replacement counsel in 2019), arguing that had Margolis conducted discovery in the manner required, those documents would have been produced and the tortious interference claim would have been resolved in GMG's favor on summary judgment.[31]

For instance, GMG's replacement counsel produced the documents, including ones suggesting that GMG had relied on the advice of counsel in determining whether to hire Wilson in light of his non-compete agreement with Lyons.[32] Because these documents were not produced earlier, Lyons filed a sanctions motion against GMG below for withholding evidence. The Court of Chancery, which informed counsel that it would fashion a sanction against GMG after trial, discussed the importance of the information that GMG failed to produce:

> I don't think this would have affected the [preliminary injunction motion]. It may have affected the summary judgment motion. But let me turn to the substance of the motion here, which is that *this information should have been produced. It clearly should have been.* I mean, this

---

[31] *See* App. to Opening Br. at A29–30 (Compl. ¶ 118); *see also* Ch. Dkt. 145 at ¶ 1 (Lyons's Motion for Sanctions).

[32] In its motion for sanctions, Lyons noted that in June 2019, "GMG produced (among other unrelated documents) introductory emails between GMG principal Charles Thomas and a Pennsylvania attorney, Douglas Maloney of Begley, Carlin & Mandio, LLP, dated October 27-28, 2015" and that "[i]n the emails, Mr. Thomas transmits copies of Mr. Wilson's Employment Agreement with Lyons and his prior USI contract, and explains: 'If we (GMG Insurance Agency) move forward and hire Mr. Wilson we would like your feedback to any restrictions that may be placed on us (or Mr. Wilson) from either of the above Agreements. And, Mr. Wilson is considering what his position will be in regard to defending himself if he joins GMG and the litigation is still open; his employer verbally said they would cover this defense cost and have done so to date, but are they obligated to provide it if he resigns?'" Ch. Dkt. 145 at ¶ 10 (Lyons's Motion for Sanctions) (citations omitted).

is not an insignificant issue in this litigation. You know, you can quibble about whether it's central or goes to the heart of the case, but *it is certainly an extraordinarily important thing if what is being litigated is whether an employee has breached his employment contract and whether his current employer tortiously interfered with the contract.* It's extraordinarily important to know what the relationship was between that new employer and the former employee. Certainly, a lot of things are possible, including that this was inadvertent, but at any rate, *it should have been produced.*[33]

Additionally, Margolis's internal email communications suggest that the delayed production was due solely to Margolis's own failures, admitting that they were "using an obsolete tool to do this discovery" and were "ill-equipped to engage in this sort of litigation."[34]

GMG also alleges that during the course of the discovery process, independent of the document production, Margolis's attorneys failed to ask GMG's principals "if they consulted with an attorney prior to GMG's hiring of Wilson, and specifically

---

[33] Ch. Dkt. 158 at 26:16–27:9 (Motion for Sanctions Hrg. Tr.) (emphasis added).

[34] *See, e.g.*, App. to Answering Br. at B50 (Compl., Ex. 2) (April 6, 2017 Email between Margolis Attorneys) ("[Lyons's counsel] are probably correct that we are using an obsolete tool to do this discovery. In truth, we are ill-equipped to engage in this sort of litigation. I have been smoke and mirroring it in our D&O cases to date."); *id.* at B53 (Compl., Ex. 3) (April 26, 2017 Email between Margolis Attorneys) ("Over the last few weeks, it has become clear to me that I am wholly inexperienced with how to handle litigation in [the Court of Chancery]. I was unaware of Delaware's comprehensive e-discovery requirements and initially treated discovery as I would in a [Pennsylvania or New Jersey] case[.] . . . [I]t has become clear to me that it is expected of those litigating in Delaware to produce documents and information in a manner that I am not familiar with. As a result of this late discovery, and as you know, we are severely behind the [eight]-ball in discovery. Opposing counsel is threatening to seek an adverse inference if we do not complete document production this week, which is next to impossible. . . . I believe this case is winnable for us, but I am concerned that we will be at a deficit if we cannot remedy these discovery issues.").

17

any discussions about whether the hiring would violate" the non-compete agreement.[35] Relatedly, Margolis did not depose Chris Redd, OTG's general counsel, regarding whether Wilson, GMG, and OTG conspired to violate Wilson's non-compete agreement with Lyons. These instances support an inference that Margolis's actions did not meet the requisite standard of care owed by a Delaware attorney.

The record permits other inferences, including that Margolis's representation satisfied the standard of care. For its part, Margolis asserts that it "fulfilled its discovery obligations to produce all responsive and non-privileged documents provided by GMG[]" and that, in any case, "any deficiency" did not "proximately cause[] any harm as alleged by GMG."[36] Margolis also vigorously contests that it did not speak with GMG's principals about whether they consulted counsel regarding Wilson's hiring,[37] and Margolis contends that GMG shut down its efforts to depose Redd.[38] But these disputed facts and the inferences to be drawn from them

---

[35] *Id.* at B10 (Compl. ¶ 48).

[36] *Id.* at B232 (Answer ¶ 118(d)).

[37] *See, e.g.*, *id.* at B210 (Answer ¶ 48) ("Margolis attorney Miller asked GMG's principals about attorney review, and asked what due diligence GMG did prior to hiring Wilson. In addition, on March 1, 2017, [Margolis counsel] requested, *inter alia*, 'Any documents or communications addressing the Lyons non-compete and what internal controls were in place (if any) to ensure it was abided by;' [which] would necessarily include any communications with counsel concerning the Lyons non-compete prior to hiring Wilson; yet GMG responded 'No documentation.'").

[38] *Id.* at B211–12 (Answer ¶ 51) ("In October of 2018 and again in March and April 2019, Margolis proposed litigation budgets to GMG which included taking the depositions of . . . Redd, but GMG never approved those budgets. Indeed . . . [Margolis attorneys] expressed [] frustration at GMG's

18

are not susceptible to resolution as a matter of law under Superior Court Civil Rule 56.

> 2. *There is a genuine dispute of material fact as to whether Margolis breached the standard of care owed by a Delaware attorney by failing to adequately brief the tortious interference claim in GMG's motion for summary judgment in the Chancery Litigation.*

GMG also contends that Margolis's failures in GMG's summary judgment briefing in the Chancery Litigation constituted legal malpractice. It alleges that Margolis did not meet the standard of care in two ways: (1) by failing to discuss the factual record and the legal elements of the tortious interference claim in any meaningful way; and (2) by failing to develop and raise an advice-of-counsel defense as to the tortious interference claim.

As GMG points out, the summary judgment briefing Margolis authored on Lyons's tortious interference claim in the Chancery Litigation is cursory at best. The analysis of tortious interference is conclusory or non-existent.[39] The briefing likewise does not describe the relevant facts related to Lyons's tortious interference claim. Nor does it raise an advice-of-counsel defense, which GMG contends would have been "critical" in defeating the tortious interference claim: "it could be used to

---

failure to respond to these prior requests for authority to depose . . . Redd[.] GMG's response was to fire Margolis[.]").

[39] *See* Ch. Dkt. 123 at 37 (stating in one conclusory sentence why Lyons's claim for tortious interference fails); *see also* Ch. Dkt. 125 at 35 (same); Ch. Dkt. 128 (failing to address the tortious interference claim).

19

help demonstrate that GMG did not have an improper motive in hiring Wilson, since all other available evidence demonstrated that GMG always was intent on making sure that Wilson complied with the terms of the Lyons [non-compete] [a]greement."[40]

Margolis claims that such record development would not be as consequential as GMG suggests. First, Margolis disputes that GMG's receipt of legal advice was critical, "particularly where the advice itself was never revealed."[41] It also disputes that testimony from the attorney who consulted with GMG's principals would have been "highly probative" or helpful in any way to GMG.[42] But these disputed facts and inferences about whether Margolis satisfied the standard of care owed by Delaware attorneys were not ones that the Superior Court could resolve at the summary judgment stage.

> 3. *There is a genuine dispute of material fact as to whether Margolis breached the standard of care owed by a Delaware attorney by simultaneously representing GMG and Wilson.*

GMG also contends that Margolis committed malpractice by simultaneously representing GMG and Wilson in the Chancery Litigation despite a potential conflict of interest. According to GMG, Margolis:

---

[40] App. to Answering Br. at B11 (Compl. ¶ 57).

[41] *Id.* at B214 (Answer ¶ 57).

[42] *Id.* at B213 (Answer ¶ 56).

> Fail[ed] to advise GMG that it was inappropriate and
> unwise for Margolis to represent both GMG and Wilson
> in the [Chancery Litigation] and to obtain their written
> informed consent before doing so if GMG chose to agree
> to joint representation, as required by Rule 1.7(b)(4) of the
> Delaware Lawyers' Rules of Professional Conduct.[43]

GMG claims that "[u]pon viewing Lyons'[s] allegations" in the Chancery Litigation, "it should have been readily apparent to [Margolis] that there was a significant possibility that Wilson was in breach of the [non-compete] [a]greement," which GMG argues was a circumstance "directly contrary to its interests."[44]  Additionally, the dual representation allegedly "forestalled [Margolis] from rendering effective legal advice to GMG[,]" "such as . . . whether it was advantageous for GMG to terminate Wilson once the lawsuit had been filed, or at any time subsequent during the pendency of the litigation."[45]

Margolis disputes that its joint representation of GMG and Wilson was problematic.  It argues that at the time, "their interests appeared to be completely aligned."[46]  Margolis also argues that GMG "fails to explain how it was harmed by Margolis'[s] joint representation of GMG with its employee Wilson, whom it wanted

---

[43] *See id.* at B23 (Compl. ¶ 118(a)); *see also id.* at B9–10 (Compl. ¶ 48).

[44] *Id.* at B7 (Compl. ¶ 37).

[45] *Id.* at B8 (Compl. ¶ 38).

[46] *Id.* at B232 (Answer ¶ 118(a)).

to keep in its employ[].”[47]  This factual disagreement likewise cannot be resolved at the summary judgment stage.

In sum, when the facts and inferences are viewed in the light most favorable to GMG, a reasonable juror could conclude that Margolis breached the standard of care owed by a Delaware attorney while representing GMG in the Chancery Litigation.  Because the factual record and the reasonable inferences to be drawn from it could support a finding in GMG's favor on its allegations of negligence, the Superior Court erred in granting summary judgment in favor of Margolis.

**B. The Superior Court erred by failing to address GMG's contention that Margolis's negligence allowed Lyons's tortious interference claim to survive GMG's summary judgment motion in the Chancery Litigation.**

The Superior Court also erred by failing to address GMG's contention that, but for Margolis's negligence, none of Lyons's claims would have survived GMG's summary judgment motion in the Chancery Litigation.  If that contention has merit, a jury could award GMG damages for the amounts it incurred to litigate and settle the case after the Court of Chancery denied its motion as to its tortious interference claim, which kept the Chancery Litigation alive for GMG.[48]  Instead of squarely addressing GMG's contention, the Superior Court found, as we discuss more fully below, that the Wilson Affidavit was a superseding cause that broke the chain of

---

[47] Answering Br. at 42.

[48] *See Chancery Opinion* at *8.

22

causation between Margolis's alleged negligence and the damages that GMG allegedly incurred.

If, however, GMG had prevailed entirely at the summary judgment stage in the Chancery Litigation, the action against GMG would have ended there, making the Wilson Affidavit immaterial, if it even would have seen the light of day. As a practical matter, in the counterfactual scenario in which GMG had been dismissed as a defendant, there would no longer have been a "cause" for the Wilson Affidavit to supersede.

If, on the other hand, the Superior Court were to determine that GMG's contention that competent representation by Margolis would have led to its outright dismissal from the Chancery Litigation is legally untenable, then the other issues raised in this appeal become moot. If GMG's premise fails on this point, its causation theory, and hence its negligence claim, fails. We leave it to the Superior Court's discretion to determine how and when to address this potentially case-dispositive issue.

The court's inquiry into this issue is complicated by the unique procedural history of the Chancery Litigation. In particular, the prospect that the summary-judgment record in the Chancery Litigation was tainted by perjured testimony knowingly relied upon by GMG is, to put it politely, concerning. On the record as we have it, however, we cannot discern whether it is Wilson's pre-summary

23

judgment testimony or his later, eve-of-trial affidavit that is false. Wilson swore that the earlier testimony was false, while GMG, upon learning of Wilson's recantation, represented to the Court of Chancery that the Wilson Affidavit was "directly contrary to [its] position . . . ."[49]

Given this dissonance and our unwillingness to allow judgment in GMG's favor if it knowingly relied on false testimony,[50] the Superior Court should, after permitting targeted discovery, engage in fact-finding to determine which side is correct. Should the court determine that the Wilson Affidavit is accurate, then it follows that GMG's summary judgment motion would have relied on testimony that, as a participant in the events described in the Wilson Affidavit, GMG knew was false. Such reliance would be inexcusable and would also fatally undermine GMG's contention that it was entitled to summary judgment on its tortious interference claim in the Chancery Litigation. And as mentioned above, if that contention fails, so does GMG's professional negligence claim. This would moot consideration of whether the Wilson Affidavit was a superseding cause of the harm GMG suffered.

Recognizing that it is conceivable that GMG will overcome the obstacles just discussed, we consider next the Superior Court's conclusion as a matter of law that

---

[49] *See supra* note 7.

[50] In this respect, we agree with our concurring colleagues that, if the Superior Court finds that GMG committed a fraud on the court, "GMG's case should be dismissed as a sanction for its misconduct." *See* Concurring Op. at 6.

24

the Wilson Affidavit was a superseding cause that broke the chain of causation between Margolis's alleged negligence and GMG's damages.

### C. The Superior Court erred in concluding that the Wilson Affidavit was a superseding cause as a matter of law.

The law respecting causation distinguishes between an "intervening" cause and a "superseding" cause. Our case law establishes the circumstances where an intervening cause is also a superseding cause. An intervening cause is one "which comes into active operation in producing an injury subsequent to the negligence of the defendant."[51] Where a defendant negligently creates a risk of harm, but another person or force later triggers the harm, the law speaks of the later-acting person or force as an intervening cause.[52] The fact that a separate cause has intervened is not "by itself" an "impediment to relief[,]"[53] nor does the mere occurrence of an intervening cause "automatically break the chain of causation stemming from the original tortious conduct."[54]

---

[51] *Delaware Elec. Co-op., Inc. v. Duphily*, 703 A.2d 1202, 1209 (Del. 1997) ("*Duphily II*") (citing *Duphily v. Delaware Elec. Coop., Inc.*, 662 A.2d 821, 829 (Del. 1995) ("*Duphily I*")).

[52] *See, e.g.*, Restatement (Second) of Torts § 442A (1965) ("Where the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.").

[53] Dan B. Dobbs et al., *Dobbs' Law of Torts* § 204 (2d ed. 2024).

[54] *Duphily I*, 662 A.2d at 829; Restatement (Second) of Torts § 457 ("If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner."); Restatement (Second) of Torts § 457 cmt. c ("If the actor's negligence results in harm to another which requires

25

To break the causal chain and make the intervening cause a superseding one, "the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor."[55] An event is foreseeable when "a reasonably prudent person would foresee that such an injury as occurred was more likely than not to result . . . from the act of negligence."[56] But where the second actor (*i.e.*, the intervenor) causes a harm that is unforeseeable—that is, outside the anticipated or reasonably foreseeable scope of the risk created by the first actor—"the second actor is a 'superseding cause' so that the negligence of the first actor is ignored and he escapes all liability."[57]

Here, the Superior Court identified the Wilson Affidavit and its damaging admissions as the force that caused GMG's damages as illustrated by the following passage in the court's opinion:

> The Court finds the undisputed evidence demonstrates that settlement would not have occurred at the time it did, or in the agreed amount, but for the Wilson Affidavit. The evidence on the record does not show that [Margolis] could reasonably foresee—twenty months before the execution of the Wilson Affidavit—that Wilson would

him to submit to hospital treatment, the actor is responsible for injuries resulting from the improper manner in which any member of the staff does his part in the normal treatment of his injuries.").

[55] *Duphily I*, 662 A.2d at 829 (citations omitted); *see also RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 864 (Del. 2015).

[56] *Sirmans v. Penn*, 588 A.2d 1103, 1106 (Del. 1991) (citation omitted).

[57] *Dobbs' Law of Torts* § 204; *see also Duphily II*, 703 A.2d at 1209 ("Thus, a third party's act is an intervening, superseding cause if it was either unforeseeable, or was foreseeable but conducted in an extraordinarily negligent manner. A foreseeable event is one where the defendant should have recognized the risk under the circumstances." (citation omitted)).

perjure himself by changing his prior sworn testimony with the Wilson Affidavit. Therefore, the Court finds the Wilson Affidavit was a superseding cause that broke the causal chain leading to the settlement of the [Chancery] Litigation.[58]

In our view, the Superior Court's focus on the foreseeability of the Wilson Affidavit misconstrues the risk of harm created by Margolis's negligent representation. That risk was that the Chancery Litigation, from which GMG arguably should have been dismissed, might be resolved adversely to its interests. And that adverse result could have come about in a variety of ways: it might be the consequence of an unexpected, damaging factual finding by the trial court, a verdict in Lyons's favor, or, as here, a settlement prompted by a change in the evidentiary landscape. Margolis is not relieved from liability because it could not foresee the precise event that might lead to or trigger the adverse litigation result; it is sufficient that it could foresee that GMG remaining as a defendant in the Chancery Litigation could lead to an unhappy ending.

This approach is consistent with causation principles set forth in the Restatement (Second) of Torts as well as in our case law. For instance, § 442B of the Restatement provides:

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force

---

[58] *Superior Court Opinion* at *4.

27

does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

Comment (b) under § 442B provides additional insight into this principle, especially in relation to the foreseeability of the manner in which the harm is ultimately triggered:

> If the actor's conduct has created or increased the risk that a particular harm to the plaintiff will occur, and has been a substantial factor in causing that harm, *it is immaterial to the actor's liability that the harm is brought about in a manner which no one in his position could possibly have been expected to foresee or anticipate*. (Emphasis added).

And to illustrate the point, the Restatement cites the well-known case of *Johnson v. Kosmos Portland Cement Co.*[59] In that case, the defendant failed to clean petroleum residue from an oil barge, creating a risk of harm to others should the barge be exposed to a flame from a torch or a lit match.[60] Neither of those triggers eventuated, but lightning struck and an explosion ensued.[61] The court recognized that the lightning strike was an unforeseeable intervening cause.[62] But because the type of harm that occurred—death or injury by explosion—was foreseeable, the

---

[59] 64 F.2d 193 (6th Cir. 1933).

[60] *Id.* at 194.

[61] *Id.*

[62] *Id.* at 197 ("Neither is [this case] within those classes . . . where a secondary efficient cause intervenes to break the chain of causation and so becomes the sole proximate cause of the injury.").

defendant could yet be held responsible.[63]  Here, the risk of an adverse litigation result is the analogue of the risk of explosion, while the Wilson Affidavit is comparable to the lightning.

These principles, moreover, sit comfortably with our precedents.  Less than a year after the Sixth Circuit decided *Kosmos Portland Cement*, this Court grappled with the concept of superseding causation in *Stucker v. American Stores Corp.*[64]  In *Stucker*, the defendant sent the plaintiff, a ten-year-old boy, on an errand to deliver merchandise about eight city blocks distant from the defendant's store.  While making the delivery, the plaintiff was struck by a motor vehicle that was negligently driven on the wrong side of the street.  The defendant argued that the motorist's negligent driving "constituted an independent, intervening proximate cause that broke the causal chain linking the defendant's . . . negligence with the injury[.]"[65]  In rejecting that argument, the Court focused on the defendant's exposure of the plaintiff to harm and the foreseeability of that harm and not the precise action that caused the harm.[66]

---

[63] *Id.* at 196 ("We think the true rule to be that when the thing done produces immediate danger of injury, and is a substantial factor in bringing it about, it is not necessary that the author of it should have had in mind the particular means by which the potential force he has created might be vitalized into injury.").

[64] 171 A. 230 (Del. 1934).

[65] *Id*. at 232.

[66] *Id*. at 233 (observing that "[a] reasonable person must be held to realize that the automobile traffic on a street may be full of hazards to a pedestrian not only because of the bustle of traffic due to carefully operated machines, but as well because of the extraordinary behavior of careless

In a similar manner, this Court in *Sirmans v. Penn* stressed that "in a case of negligent conduct followed by an intervening act causing injury, liability of the tortfeasor should turn on whether '*the risk of particular consequences* is sufficiently great to lead a reasonable man . . . to anticipate them, and to guard against them.'"[67] And in this case "the risk of consequences" as previously noted was the risk of liability that attended GMG's continuing participation in—rather than its dismissal from—the Chancery Litigation.

And, in *Delaware Electric Co-op., Inc. v. Duphily*, an employee (Duphily) of a mobile home company (New Look) was injured by a low hanging live wire as he stood atop a moving mobile home and reflexively grabbed the live wire when he lost his balance.[68] The low hanging live wire was due to the negligence of Delaware Electric, who inadequately "resagged" the wire after it fell during a storm. Although Delaware Electric argued that New Look having Duphily stand atop a mobile home while it was being backed into its plot was a superseding cause, a jury found, and this Court agreed, that the risk created by the low live wire was foreseeable—even

---

people"); *see also Delaware Elec. Cooperative, Inc. v. Pitts*, 633 A.2d 369, 1993 WL 445474, at *2 (Del. Oct. 22, 1993) (TABLE) ("An event is foreseeable if a defendant should have recognized the risk of injury under the circumstances. It is irrelevant whether the particular circumstances were foreseeable.").

[67] 588 A.2d 1103, 1107 (Del. 1991) (emphasis added) (quoting *Delmarva Power & Light Co. v. Burrows*, 435 A.2d 716, 719 (Del. 1981)).

[68] *Duphily I*, 662 A.2d at 825.

if the particular way the injury came about was not.[69]  Here, the risk of an adverse litigation result is the analogue of the risk of someone being harmed by the low hanging live wire, while the Wilson Affidavit is comparable to Duphily standing atop a mobile home in motion.

Our concurring colleagues reprove us for insufficiently attending to the intentionality—and conceivable criminality—of the Wilson Affidavit.  That is not our intention.  We readily concede that, under § 442B of the Restatement, whether the harm is intentionally caused by the intervening actor is a relevant and potentially dispositive issue.  But, in our view and according to § 442B's explicit terms, it will only be dispositive when the intentionally caused harm "is not within the scope of the risk created by the [initial] actor's [here, Margolis's] conduct."  And the Superior Court did not address—and the concurrence seems to downplay—that essential aspect of the superseding-cause doctrine.  Nor could the Superior Court have addressed that issue on summary judgment, because whether Wilson's changed testimony was within the scope of the risk created by Margolis's conduct—*i.e.*,

---

[69] *Duphily II*, 703 A.2d at 1209–10 ("[Delaware Electric] cannot reasonably argue . . . that backing a mobile home into a mobile home park is unforeseeable. . . .  Thus, we conclude that sufficient evidence was adduced at trial to support the jury's finding that New Look's negligent actions were not an intervening, superseding cause of Duphily's injuries."); *id.* at 1210 n.10 (quoting the jury instructions that stated "it is not necessary for [Delaware Electric] to foresee that anybody would be standing on top of a mobile home.  It's merely enough that injury from shock was foreseeable" (cleaned up)).

whether Margolis's conduct was indeed the proximate cause of the harm or not—involves a factual question for the jury.[70]

In brief, the Superior Court's departure from the principles discussed above led it to the erroneous and reversible conclusion that the Wilson Affidavit was, as a matter of law, a superseding cause of GMG's damages.

## IV.  CONCLUSION

For the foregoing reasons, the Superior Court erred in granting Margolis Edelstein's motion for summary judgment.  We therefore REVERSE the judgment of the Superior Court.  We REMAND this case to the Superior Court for further proceedings consistent with this Opinion.  Jurisdiction is not retained.

---

[70] *Jones*, 1 A.3d at 303 ("[T]he jury . . . must determine whether the intervening cause should supersede the defendant's liability.  The jury decides the mixed question of law and fact at issue—whether, in the specific factual context, the intervening cause constitutes abnormal, unforeseeable or extraordinary negligence that would as a matter of law supersede a defendant's negligence thereby relieving that defendant of liability to the plaintiff." (citation omitted)).

**SEITZ**, Chief Justice, concurring, in which **VALIHURA**, Justice, joins:

I agree with the Majority that the Superior Court erred in granting Margolis Edelstein's motion for summary judgment. But I would reverse because a material issue of disputed fact exists whether GMG committed a fraud on the court and therefore forfeited any right to relief. And even if GMG was not privy to or did not participate in Wilson's perjured testimony, the Superior Court should still decide whether the false testimony was an unforeseeable intervening act by a third party and therefore a superseding cause that cuts off Margolis's liability. The Majority's superseding cause analysis fails to account sufficiently for intentional acts by third parties – such as Wilson's perjury – that are superseding acts that can break the causation chain.

## I.

In the Court of Chancery litigation, Wilson's pre-trial deposition testimony and later affidavit and trial testimony set forth two versions of the facts. In his pre-trial deposition testimony, when represented by counsel jointly with GMG, Wilson

testified that he and GMG did not agree to keep OTG as a permanent client.[1] GMG adopted the same stance in its pre-trial brief.[2]

On the eve of trial, however, Wilson, now represented by his own counsel and having departed GMG, stated in an affidavit that, from late 2015 to early 2016, he met with GMG's principals and OTG's CFO and general counsel. According to Wilson, they discussed OTG's permanent relationship with GMG and Wilson's move from Lyons to GMG.[3] He offered the same testimony at trial the next day after GMG settled and exited the Court of Chancery litigation.[4]

The question, as GMG's opening brief posits, is whether "Wilson's affidavit, and his 'revised' testimony at the December 10, 2020 hearing [was] true, or was his pre-affidavit testimony in the Lyons litigation the truth?"[5] In the lie/truth scenario,

---

[1] *See* App. to Appellee's Answering Br. at B428, *Lyons Ins. Agency Inc. v. Wilson*, C.A. No. 2017-0092-SG (Del. Ch. June 14, 2017) [hereinafter B__] ("My intention all along was to try to get OTG and the other clients back to Lyons.").

[2] Defendant GMG Insurance Agency's Opening Pre-Trial Brief at 6 (Del. Ch. Nov. 20, 2020), Docket No. 165 [hereinafter Ch. Dkt. __].

[3] B197–98, *GMG Ins. Agency v. Margolis Edelstein*, No. N21C-07-002 (Apr. 10, 2023). In the Wilson Affidavit, he alleges that in late 2015, he began discussing the possibility of joining GMG with the two principal heads of the company. *Id.* at B197. On December 8, Wilson met with the general counsel of OTG to discuss a "preliminary plan" OTG finding a home at GMG and Wilson coming onboard to GMG to service OTG. *Id.* at B198. On March 15, 2016, Wilson met with GMG's principals again, as well as OTG's CFO, to develop the plan. *Id.* Around two months later, Wilson shared this plan with OTG's general counsel, who "agreed with this plan." *Id.*

[4] Trial Transcript at 39, 49 (Del. Ch. Dec. 10, 2020), Ch. Dkt. 188.

[5] Appellant's Opening Brief at 23, *GMG Ins. Agency v. Margolis Edelstein*, No. N21C-07-002 (Apr. 10, 2023).

even though GMG denied it, Wilson's deposition testimony implies that GMG colluded with Wilson and OTG to skirt the Pennsylvania court's injunction against Wilson and Wilson's noncompete with Lyons. In the truth/lie scenario, Wilson did not perjure himself when he first testified in the Court of Chancery litigation that GMG and Wilson did not agree to solicit OTG as a permanent client. Instead, his perjury occurred later, when he gave false testimony in his affidavit and at trial. In this situation, Wilson's perjury would not implicate GMG.

On remand, the Superior Court should sort out the facts.[6] As explained next, if the court concludes that GMG was a party to or had knowledge of Wilson's perjured testimony (the lie/truth scenario) and GMG now relies on the perjured testimony to support its legal malpractice action, then GMG committed a fraud on the court and is not entitled to any relief.

## A.

Fraud on the court is a corruption of the judicial process.[7] It "defile[s] the court itself" and disables "the judicial machinery" such that it "cannot perform in

---

[6] "Superior Court" here means the relevant decisionmaker. Fraud on the court is addressed by the judge. See *Smith v. Williams*, No. CIV.A. 05C-10-307PLA, 2007 WL 2193748, at *3 (Del. Super. Ct. July 27, 2007) (citing *Gebhart v. Ernest DiSabatino & Sons, Inc.*, 264 A.2d 157, 159 (Del. 1970) ("It is an inherent power of the Trial Court arising from the control necessarily vested in the Court to manage its own affairs and to achieve the orderly and expeditious disposition of its business.")). As discussed later, causation is addressed by the judge at summary judgment, or the factfinder at trial.

[7] The other meaning for fraud on the court in Delaware involves contracts that "offend public policy or harm the public," and so are rendered "void *ab initio*, Latin for 'from the beginning.'"

the usual manner its impartial task of adjudging cases."[8] Typically, a party to a prior judgment invokes fraud on the court to set aside the judgment.[9] Courts are reluctant to upset final judgments "out of deference to the deep-rooted policy in favor of the repose."[10] But allowing the "most egregious conduct involving a corruption of the judicial process itself" to occur without redress harms the public welfare.[11] The remedies are severe if fraud on the court is proven by clear and convincing evidence.[12] They include dismissing a case.[13]

*Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011). By violating the constitution, these contracts are so fraudulent that recognizing the agreements as a validly formed contract would be "fraud on the court." *See id.* at 442 n.25; *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1068 n.25 (Del. 2011). This meaning is irrelevant for our purposes, as the contractual relationship where Margolis represented GMG's interests does not violate public policy.

[8] 12 Daniel R. Coquillette et al., *Moore's Federal Practice-Civil* § 60.21 (2024).

[9] *See generally* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2870 (3d ed.) (Fraud on the Court).

[10] *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944).

[11] *MCA, Inc. v. Matsushita Elec. Indus. Co.*, 785 A.2d 625, 639 (Del. 2001) (quoting 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2870 (3d ed.) (Fraud on the Court)).

[12] *See Smith*, 2007 WL 2193748 at *4 (citing *Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1120 (2d Cir. 1970)); *accord United States v. Am. Bell Tel. Co.*, 167 U.S. 224, 251 (1897) ("[A] suit between individuals to set aside an instrument for fraud can only be sustained when the testimony in respect to the fraud is clear, unequivocal, and convincing, and cannot be done upon a bare preponderance of evidence which leaves the issue in doubt . . . .").

[13] *See Smith*, 2007 WL 2193748 at *4.

Typically, perjury alone "would generally not support a finding of fraud upon the court."[14] There are already "ordinary processes and rules" designed to expose such "evils" intrinsic to trials.[15] "[E]xtrinsic fraud," however, "affects the integrity and fairness of the judicial process itself."[16] It can be "so subversive that it actually prevents an issue from being joined or a party from making a valid claim or defense."[17]

Framed another way, perjury is ordinarily fraud *between the parties*. Fraud *on the court* requires a higher threshold of misconduct "directed to the judicial machinery itself . . . where the impartial functions of the court have been directly corrupted."[18] For instance, misconduct by an attorney, an officer of the court, can establish fraud on the court, such as "bribery of a judge or juror, improper influence exerted on the court by an attorney, or involvement of an attorney as an officer of

---

[14] *Johnson v. Preferred Pro. Ins. Co.*, 91 A.3d 994, 1012 (Del. Super. Ct. 2014). In a 1991 order, our Court referred to perjury as a "reprehensible fraud on the court." *Calder v. Calder*, 588 A.2d 1142, 1991 WL 28897, at *2 (Del. Feb. 26, 1991) (TABLE). Neither that order nor the subsequent order in the follow-up case analyzed fraud on the court in a substantive way. *See id.*; *Calder v. Calder*, 610 A.2d 723, 1992 WL 115949 (Del. Apr. 9, 1992) (TABLE).

[15] *Smith*, 2007 WL 2193748 at *5.

[16] *Id.*

[17] *Id.*

[18] *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985).

the court in the perpetration of fraud."[19]  Nonetheless, "[a]ny fraud connected with the presentation of a case to a court is a fraud upon the court, in a broad sense."[20]

Here, Wilson's pre-affidavit testimony, by itself, was most likely perjury in the Court of Chancery litigation and fraud between the parties to that case.[21]  But if GMG then used Wilson's false testimony to prop up its separate legal malpractice action, it qualifies as a fraud on the court.  Stated another way, GMG would be converting fraud between the parties into a fraud on the court.  On remand, the Superior Court should decide whether this is the case.  If so, GMG's case should be dismissed as a sanction for its misconduct.

## II.

Putting aside fraud on the court, I agree with the Majority that the Superior Court erred when it decided that there was insufficient evidence to demonstrate that Margolis breached the standard of care in the Court of Chancery litigation.  I do not, however, agree with the Majority's reasoning on causation.  Even if GMG was

---

[19] *Smith*, 2007 WL 2193748 at *4.

[20] Wright & Miller, *Federal Practice and Procedure* § 2870; *accord Hazel-Atlas*, 322 U.S. at 245 (finding a "deliberately planned and carefully executed scheme to defraud" the U.S. Patent Office and the Third Circuit to constitute fraud on the court).

[21] Following the 2020 trial, the Vice Chancellor assessed Wilson fifty percent of Lyons's counsel fees, from the beginning of litigation up to the court's 2018 summary judgment opinion, because of Wilson's bad-faith actions.  *See* B759–60.  Lyons was also awarded damages of 1.5 times the "Moved Business" with prejudgment interest from the time of breach.  *Id.* at 760.  Though Wilson discussed the fraudulent plan with OTG's general counsel – who presumably is an officer of the court – OTG has never been a party in these cases.

ignorant of Wilson's fabricated testimony, the court must still decide whether Wilson's testimonial about-face was a superseding cause that cut off Margolis's liability. I do not, therefore, join Parts III-B and III-C of the Majority opinion.

A.

As the Majority notes, to prevail on a legal negligence claim in Delaware, a plaintiff must establish three elements: (i) the employment of the attorney; (ii) the attorney's neglect of a professional obligation; and (iii) resulting loss.[22] To prove a resulting loss, the plaintiff must demonstrate "that the underlying action would have been successful but for the attorney's negligence."[23] The plaintiff must also demonstrate "that there is a reasonable connection between the negligent act or omission of the defendant and the injury which the plaintiff has suffered."[24] A proximate cause is one "which[,] in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred."[25] By contrast, an intervening cause is "one which comes

---

[22] *Oakes v. Clark*, 39 A.3d 371, 2013 WL 3147313, at *1 (Del. June 18, 2013) (TABLE) (citing *Weaver v. Lukoff*, 511 A.2d 1044, 1986 WL 17121, at *1 (Del. July 1, 1986) (TABLE)).

[23] *Sherman v. Ellis*, 246 A.3d 1126, 1131 (Del. 2021) (quoting *Oakes*, 69 A.3d 371, 2013 WL 3147313, at *1 (Del. June 11, 2013) (TABLE)).

[24] *Culver v. Bennett*, 588 A.2d 1094 (Del. 1991) (quoting *Elliott v. Camper*, 194 A. 130, 132 (Del. Super. Ct. 1937).

[25] *Id.* at 1097 (quoting *James v. Krause*, 75 A.2d 237, 241 (Del. Super. Ct. 1950), *superseded by statute*, 64 *Del. Laws* 920, 10 *Del. C.* § 8132 (1984)).

7

into active operation in producing an injury *subsequent* to the negligence of the defendant."[26]

An intervening cause "does not automatically break the chain of causation stemming from the original tortious conduct."[27]  To break the "natural and continuous sequence" between the original tortious act and the resulting loss, "the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor."[28]  I agree with the Majority that what separates an intervening cause from a superseding cause is foreseeability.  I disagree, however, with the Majority's framework for deciding what separates an intervening cause from a superseding cause.

The Majority holds that the Superior Court erred in its foreseeability analysis by focusing on the foreseeability of the Wilson Affidavit.  Doing so, the Majority concludes, "misconstrues the risk of harm created by Margolis's negligent representation," which is the possibility that the Court of Chancery litigation "might be resolved adversely to [GMG's] interests."[29]  And because Margolis "could foresee

---

[26] *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 829 (Del. 1995) (emphasis in original) (citations omitted).

[27] *Id.*

[28] *Id.* (citations omitted).

[29] *Majority Opinion* at 27.

8

that GMG's remaining as a defendant in the Chancery Litigation could lead to an unhappy ending," Margolis is "not relieved from liability because it could not foresee the precise event that might lead to or trigger the adverse litigation result."[30] In other words, the Majority has determined that a defendant remains liable in a legal malpractice case where the harm is foreseeable, but the intervening cause is not. The focus of the foreseeability analysis, the Majority concludes, is whether the eventual harm itself is foreseeable, not whether the intervening cause is foreseeable.

For support, the Majority relies on Section 442B of the Restatement (Second) of Torts, which provides:

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, *except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.*[31]

But the Majority does not come to grips with the exception portion of the Second Restatement. It calls for a foreseeability analysis of the intervening *act* itself under certain circumstances. Where the harm is intentionally caused by a third party, the Second Restatement directs the inquiry to whether the intentional act by the third party – here, the contradictory affidavit submitted by Wilson – is within the scope of

---

[30] *Id.*

[31] Restatement (Second) of Torts § 442B (Am. L. Inst. 1965) (emphasis added).

9

the risk created by the defendant's original negligent conduct. The Majority fails to take that additional analytical step.

The Majority also points to Comment (b) to Section 442B, which provides as follows:

> If the actor's conduct has created or increased the risk that a particular harm to the plaintiff will occur, and has been a substantial factor in causing that harm, it is immaterial to the actor's liability that the harm is brought about in a manner which no one in his position could possibly have been expected to foresee or anticipate.[32]

From Comment (b), the Majority concludes that the foreseeability of the Wilson Affidavit is immaterial because Margolis's alleged negligence created or otherwise increased the risk that an adverse litigation event would occur.

But Comment (b) reiterates the exception to the general proposition concerning "intentionally tortious or criminal intervention . . . not within the scope of the risk created by the original negligent conduct."[33] The Majority truncates the superseding causation analysis at whether the ultimate harm – "an unhappy ending" – is foreseeable, without considering whether the manner in which the ultimate harm was brought about is an intentional intervention by a third-party (such as an

---

[32] Restatement (Second) of Torts § 442B cmt. b (Am. L. Inst. 1965).

[33] *Id.*

10

intentionally tortious or criminal act), and, if so, whether such intervention is foreseeable given the original negligent act by the defendant.

Furthermore, Comment (c) explicitly provides that if the tortious or criminal act of a third party is not foreseeable, "the actor is relieved of responsibility by the intervention of the third person."[34] Comment (c) observes that "[t]he reason usually given by the courts is that in such a case the third person has deliberately assumed control of the situation, and all responsibility for the consequences of his act is shifted to him."[35] Under these circumstances, the intentional act by the third party severs the "reasonable connection between the negligent act or omission of the defendant and the injury which the plaintiff has suffered."[36] Thus, even if the plaintiff establishes that, but for the original tortfeasor's negligence, the plaintiff would not have suffered the harm or been placed in the position to suffer the harm, the plaintiff has not satisfied the "reasonable connection" requirement.

The Majority's truncated foreseeability analysis has consequences. To hold a defendant liable in all circumstances where the end harm is foreseeable, but the intervening harm is not, would impose greater liability upon Margolis than appropriate. Under the Majority's causation framework, the defendant attorneys are

---

[34] Restatement (Second) of Torts § 442B cmt. c (Am. L. Inst. 1965).

[35] *Id.; see also* Restatement (Second) of Torts § 442B cmt. c, illus. 9–10 (Am. L. Inst. 1965).

[36] *Culver*, 588 A.2d at 1094 (quoting *Elliott v. Camper*, 194 A. 130, 132 (Del. Super. Ct. 1937)).

11

liable because "it is sufficient that [the defendant attorneys] could foresee that the [plaintiffs] remaining in the [underlying litigation] could lead to an unhappy ending."[37] This renders Delaware attorneys the guarantors of litigation success from the point they breach their duty of care even if such breach was negligible and despite any superseding act that might cause the same type of foreseeable harm. Without any limiting principle, a small breach may lead to disproportionate liability.

## B.

The Majority cites four cases in support of its foreseeability analysis. The first two cases fall into a category in which a defendant tortfeasor is not relieved of liability where an unforeseeable intervening act causes a foreseeable result.[38] In *Johnson v. Kosmos Portland Cement Co.*, the defendant failed to clean up the oil residue in a barge, causing a build-up of flammable gasses[39] that could ignite and explode if exposed to a lighted match, a torch, or a spark produced by tool or boot.[40]

---

[37] *Majority Opinion* at 27.

[38] *See* Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 209 (2d ed. 2011). Other similar cases, as cited by the Second Restatement, include *McDowell v. Village of Preston*, 116 N.W. 470 (Minn. 1908); *Gibson v. Garcia*, 216 P.2d 119 (Cal. Ct. App. 1950); *Mars v. Meadville Telephone Co.*, 23 A.2d 856 (Pa. 1942); *Village of Carterville v. Cook*, 22 N.E. 14 (Ill. 1889); and *Watson v. Kentucky & Indiana Bridge & R. Co.*, 126 S.W. 146 (Ky. 1910), *abrogated by Britton v. Wooten*, 817 S.W.2d 443 (Ky. 1991).

[39] *Id.* at 194.

[40] *Id.* at 197.

As it turned out, lightning struck the barge and caused an explosion.[41] The court held that the intervening cause – the lightning strike – was unforeseeable.[42] Nevertheless, the court held the defendants responsible on the grounds that the type of harm – serious injury or death due to an explosion – was foreseeable in a barge filled with oil residue.[43]

The second case, *Duphily v. Delaware Electric Co-op., Inc.*, is a case decided by this Court.[44] In *Duphily*, the defendant "resagged" electrical wires between utility poles without measuring the correct "sag."[45] The electrical wires ended up sagging too low, which increased the likelihood that someone would be electrocuted. An employee of a mobile home company was electrocuted when, standing on top of a moving mobile home and losing his balance, he instinctively grabbed onto the live electrical wires.[46] We found that the type of harm – serious injury or death due to electrocution – was foreseeable when live electrical wires are sagged too low.

---

[41] *Id.* at 194.

[42] *Id.* at 197.

[43] *Id.* at 196.

[44] *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821 (Del. 1995).

[45] *Id.* at 825. Sagging refers to the practice of loosening electrical wires between two utility poles to achieve the correct catenary, which is scientifically calculated. Sagging is important when installing electrical wires because it allows electrical wires to expand and contract.

[46] *Id.* at 825–26.

Neither case, however, involved an intervening act which is intentionally tortious or criminal and is not within the scope of the risk created by the initial negligence. In other words, the two cases do not address circumstances where the intervening act is an unforeseeable act by a third-party and intentionally tortious or criminal in nature.

The third case relied upon by the majority falls into a category of a defendant tortfeasor who is not relieved of liability when both an intervening act and the resulting loss are foreseeable, despite *non*-intentional third-party actions. In *Stucker v. American Stores Corp.*, the defendant negligently sent a ten-year-old boy on an errand to deliver merchandise approximately eight city blocks away.[47] The errand required the young boy to travel over streets and crossings with heavy traffic, a journey filled with dangers "a child of his years would not and could not know or appreciate and against which he could not reasonably or adequately protect himself. . . ."[48] A motorist driving on the wrong side of the street struck the boy and injured him.[49]

---

[47] 171 A. 230, 231 (Del. 1934).

[48] *Id.*

[49] *Id.*

The court held that the third-party intervening cause – the negligent driver – was "not so unusual as not to be reasonably probable."[50] *Stucker* belongs to a category of cases where the defendant is not relieved of liability because both the intervening act and the resulting harm are foreseeable. It does not address situations where the intervening act is an unforeseeable intentionally tortious or criminal act by a third-party.

The fourth case cited by the Majority is most analogous to the case at hand. In *Sirmans v. Penn*, the defendant negligently left his car running in a high crime area in the middle of the night while visiting a relative's residence several townhouses away from the street.[51] An unknown individual stole the defendant's car and injured the faultless plaintiff in a head-on collision.[52] This Court held that the intervening cause – the thief stealing the car – was not a superseding cause that would cut off liability.[53] In doing so, we reiterated that "in a case of negligent conduct followed by an intervening act causing injury, liability of the tortfeasor

---

[50] *Id.* at 233.

[51] *Sirmans v. Penn*, 588 A.2d 1103, 1104 (Del. 1991).

[52] *Id.*

[53] *Id.* at 1107–08.

should turn on whether 'the risk of particular consequences is sufficiently great to lead a reasonable man . . . to anticipate them, and to guard against them.'"[54]

The Majority points to this quote from *Sirmans* for the proposition that the inquiry should *always* focus on the end harm. This is understandable given a plain reading of the case and the quote, the latter of which is taken from Prosser's *Handbook of the Law of Torts*.[55] A close reading of the *Handbook*, however, does not support the Majority's position. The quote is from a section discussing the standard for determining unreasonable risks. The complete paragraph is as follows:

> Previous reference has been made to the distinction between negligence and intent. In negligence, the actor does not desire to bring about the consequences which follow, nor does he know that they are substantially certain to occur, or believe that they will. *There is mere a risk of such consequences, sufficiently great to lead a reasonable man in his position to anticipate them, and to guard against them.* If an automobile driver runs down a man in the street before him, with the desire to hit him, or with the believe that he is certain to do so, it is an intentional battery; but if he has no such desire or believe, but merely acts unreasonably in failing to guard against a risk which he should appreciate, it is negligence. As the probability of injury to another, apparent from the facts within his knowledge, becomes greater, his conduct takes on more of the attributes of intent, until it reaches that substantial certainty of harm which juries, and sometimes courts, may find inseparable from intent itself. Such intermediate mental states, based upon a recognizable great probability of harm, may still properly be classed as "negligence," but are commonly called "reckless," "wanton," or even "wilful [sic]." They are dealt with, in many respects, as if the harm were intended, so that they become in effect a hybrid

---

[54] *Id.* at 1107 (quoting *Delmarva Power & Light Co. v. Burrows*, 435 A.2d 716, 719 (Del. 1981)).

[55] William L. Prosser, *Handbook of the Law of Torts* 145 (4th ed. 1971).

16

between intent and negligence, occupying a sort of penumbra between the two. They will be dealt with in a later section.[56]

The complete paragraph, read in the context of the entire section, relates to the "risk of consequences" to distinguish negligence from intentional torts. The focus of the section is on unreasonable risks. The chapter covers the standard of care in negligence cases. In other words, the quote is a commentary on duty, not causation. The question addressed by the section is distinguishing negligence from intentional battery, not superseding causation.

Finally, in the section discussing intervening causation, the *Handbook* addresses the problem of "foreseeable results of unforeseeable causes"[57] by listing cases in which the defendant should still be held liable:

- "A ladder left standing in the street blown down by an unforeseeable wind"

- "An obstruction in the highway with which a runaway horse collides"

- "Delay upon a railway track because of the unexpected lowering of the crossing gates"

- "An insecure gas pipe bursting because it was struck by an automobile"

- "A loose pile of lumber knocked over by a stranger"

---

[56] *Id.* at 145–46 (citations omitted).

[57] *Id.* at 286.

- "A termite-riddled telephone pole thrown down by an automobile which comes upon the sidewalk"

- "[A] cattle driven from a farmyard wandering back onto a railway onto which they had escaped in the first instance because of improper fencing".[58]

The *Handbook* also lists cases in which "it seems equally clear that the defendant should not be liable":[59]

- "A knocks B down and leaves him lying unconscious in the street, where he may be run over by negligently driven automobiles, and C, a personal enemy of B, discovers him there and intentionally runs him down"

- "When the defendant excavates a hole in the sidewalk into which someone might fall, he may be liable if the plaintiff is negligently pushed into it by a stranger, but [not] if he is pushed deliberately"

- "[W]here a chair seat is left on a balcony railing, and it is purposefully thrown down"

- "[Where] a stranger impersonating an elevator operator deliberately invites the plaintiff to step into an open shaft."[60]

According to the *Handbook*, "[t]he difference between the two groups of cases is a matter of intangible factors not easy to express."[61] This difference "apparently

---

[58] *Id.* at 286–87 (citations omitted).

[59] *Id.* at 287 (citations omitted).

[60] *Id.* (citations omitted).

[61] *Id.*

18

lies in the conclusion of the courts that in the latter type of case the responsibility is shifted to the second actor."[62]  The *Handbook* further states that "[w]here there is a malicious or criminal act, the original actor might be free to say, even if he had anticipated the misconduct, that it was not his concern, whereas he might still be responsible for the inadvertence or ignorant blunders."[63]  Stated differently, the original negligent party is not liable where the intervening cause is an intentional act (malicious or criminal act) by a third party, but she is liable where the intervening act is a negligent act (e.g., inadvertence or ignorant blunders) by a third party.  The *Handbook* concludes that "[w]here [the original negligent party] would be relieved of responsibility even if the [intervening] act were to be anticipated, he should be *no less* relieved when it is unforeseeable, even though the result is part of the risk he has created."[64]

## C.

As the foregoing discussion shows, the superseding cause analysis must consider not only whether the harm caused by the negligent act was foreseeable, but also whether the intervening act itself was foreseeable when it involves intentional or criminal conduct.  On remand, I believe that the Superior Court needs to answer

---

[62] *Id.*

[63] *Id.* (citations omitted).

[64] *Id.* (emphasis added).

two questions to resolve the superseding cause inquiry – first, whether Wilson perjured himself when he submitted the pretrial affidavit and testified at trial; and second, if so, whether his intentional and criminal act, perjury, was a foreseeable act that would relieve Margolis of liability.

## III.

For the reasons stated above, I agree with the Majority that the Superior Court decision should be reversed. It appears that we agree that fraud on the court should be considered on remand. I respectfully disagree, however, with the Majority's superseding cause analysis. Therefore, I concur only in the result.